GRAVES, Justice,
for the Court.
¶ 1. Husband and wife were married, and a child was born to the marriage five months later. The couple separated, and the husband sued for divorce years later, after he had assumed the primary child-rearing responsibilities at the wife’s request. Husband sought custody of the child because of the wife’s drug use. On the day the trial for divorce was scheduled to start, the wife told the chancellor in chambers there was a strong possibility the husband was not the child’s biological father. Subsequent blood testing excluded the husband from being the child’s biological father. The chancellor, however, found the husband to be the child’s “father-in-fact” through judicial adoption and through judicial estoppel, awarded him physical custody of the child, and required the wife to pay child support to the husband. The wife now appeals the chancellor’s ruling.
FACTUAL AND PROCEDURAL HISTORY
¶ 2. Tom Morgan (Tom) and Jane Morgan (Jane) were married in Tunica County on January 6, 1996, and a daughter, Catherine, was born of the marriage on June 21, 1996.[1] Tom and Jane finally separated on September 5, 1998, and Tom later filed a Complaint for Divorce and Other Relief on December 11, 2001. Tom alleged that Jane was guilty of cruel and inhuman treatment, adultery, habitual and excessive drug abuse, and also pleaded irreconcilable differences as grounds for divorce. Tom also sought temporary and permanent custody of Catherine and child support from Jane.
¶ 3. The chancellor held a hearing on December 12, 2001, and entered a temporary order which alternated custody of Catherine between Tom and Jane every two weeks. Tom later filed a motion on June 21, 2002, for a hearing and a preliminary injunction against Jane, seeking that her visitation with Catherine be under strict supervision by the court. Jane’s counsel, Curt Crowley, filed a motion for a continuance on June 27, 2002, based on a conflict in his schedule, and further informed the court of his intent to withdraw from his representation of Jane.
*763 ¶ 4. Tom’s motion came before the chancellor at a hearing on July 17, 2002. Joe Morgan Wilson entered an appearance as Jane’s attorney at this hearing, replacing Crowley as counsel. Testimony regarding Jane’s drug use was introduced during this hearing, and the chancellor issued a temporary order which awarded custody of Catherine to Tom, with Jane receiving visitation every other weekend. The chancellor also admonished Jane to get help for her drug use and ordered both parties to refrain from using any alcohol or illicit drugs while Catherine was in either party’s physical custody. This order was' to remain in place until a permanent order could be entered pursuant to a trial.
¶ 5. The divorce action was set for trial before the chancellor on October 28, 2002. Jane finally filed her Answer to Tom’s Complaint for Divorce and asserted a Counter Complaint on that date. She admitted all of the allegations in Tom’s complaint, which included assertions that Catherine was a child born to the marriage, that Tom should retain temporary custody of Catherine until this matter was finally adjudicated, that Tom should get permanent custody of Catherine, and that Tom should receive a reasonable amount of support and maintenance for Catherine. In Jane’s Counter Complaint for Divorce, she asserted that Catherine was born of the marriage on June 21, 1996, she (Jane) should be awarded “paramount care, custody, and control of’ Catherine, and Tom should have to pay her child support. Tom and Jane both signed an affidavit on October 28, 2002, indicating that they had agreed to an irreconcilable differences divorce and consented to have the court decide all issues concerning property settlement and child custody, maintenance, and visitation.
¶ 6. Before Tom began his case-in-chief on October 28, 2002, Jane informed her counsel that Tom might not be Catherine’s natural father. This issue was brought ore tenus before the chancellor in chambers, and the chancellor instructed that this information should not be made known to anyone else, especially. Catherine. At the trial on October 28, Tom introduced testimony of Jane’s drug abuse, the less-than-ideal living conditions that Catherine was subjected to when in Jane’s care, and the lack of stability in Jane’s life to support his argument that it was in Catherine’s best interests to be in his care and custody. Jane’s counsel sought to refute the allegation that Tom was more suitable to retain primary custody of Catherine by pointing out that Tom had previously had a problem with alcohol and by showing that Tom’s current sexual relationship with Kim Swindoll was adulterous, as Tom was still legally married to Jane at that time. At the conclusion of testimony on that day, the chancellor recessed the trial until November 19th.
¶ 7. Jane subsequently filed a Petition Requesting Blood Test and Other Relief on November 19, 2002. The chancellor entered an order on December 4, 2002, directing the parties to brief the legal issues concerning whether he could or should grant Jane’s request for blood testing.' The parties ultimately agreed to have a blood test done, and the chancellor signed an Agreed Order for Paternity Testing on January 29, 2003. The chancellor also held a closed hearing that same day, with only the parties and their attorneys present. At the end of the hearing, the chancellor presented Jane with two options in light of the paternity test which excluded Tom as the natural father. One option was to completely cut Tom out of Catherine’s life by declaring that he had no parental rights; the other option was to continue to hold Tom out as Catherine’s father and treat him no differently than if he were in fact Catherine’s biological fa *764 ther. He did not require Jane to state which option she preferred at that time, but rather, admonished her to think long and hard about the implications of her decision. He also admonished the parties to work out and agree to a revised temporary custody order before the next hearing date.
¶ 8. In light of the January 29th hearing, Jane filed a Petition to Modify Former Temporary Order on February 18, 2003, seeking to have the prior temporary order of December 12, 2001, reinstated, which gave Tom and Jane sole physical custody of Catherine on an alternating two-week basis. Two days later, Jane filed a Petition Requesting Termination of Rights. In her petition, Jane asserted that she had attempted to negotiate a modified custody arrangement that was agreeable to Tom, that Tom insisted on retaining “paramount physical custody” of Catherine even though he was not her biological father, and that she wanted the court to terminate all of Tom’s parental rights.
¶ 9. The chancellor held a hearing on March 25, 2003, on Jane’s petition to terminate Tom’s parental rights. In addition to both parties introducing testimony to show that each should be the proper custodian of Catherine, Nick Harrison, the man that Jane now asserts is Catherine’s biological father, came forth to testify. Harrison testified that he did not recall having sexual relations with Jane during the Fall of 1995, when Catherine would have been conceived, though he did admit to having sex with Jane after Catherine was born. This testimony ran counter to Jane’s assertions at a prior hearing that she had sex with Harrison during the time period of Catherine’s conception. Harrison also testified that he had no plans to determine if he was Catherine’s biological father (largely because he did not think he was her father), he had not established any kind of relationship with Catherine, and he had no plans on developing a relationship with Catherine even if he were determined to be her biological father. At the end of the hearing, the chancellor ruled that, under the facts presented to him, Tom Morgan would continue to be recognized as Catherine’s “father in fact — either equitably through judicial adoption of some sort, or through judicial estoppel on the part of anyone complaining about it.” His ruling was a “best interest of the child” determination based on Tom’s prior relationship with Catherine, the fact that the putative father neither wanted to be adjudicated as Catherine’s father nor pursue any relationship with her, and the fact that “there’s nobody else in the wings, standing, clamoring to be a father to this child.” The chancellor also provided Jane with more visitation rights, required her to submit to additional drug testing, and indicated that he would make his ultimate custody ruling at the next hearing.
¶ 10. The final hearing as to custody of Catherine was held on June 24, 2003. Both Tom and Jane testified that visitation was going more smoothly than at the time of the previous hearing, they were communicating better now, and Catherine seemed to have adjusted well to the current visitation schedule. Tom admitted that Jane had made great improvements in her personal life and that he did not have as much concern about Catherine being around Jane as he did previously. Tom even admitted that he did not require Jane to submit to additional drug testing ordered by the court because of his belief that she was “doing a lot better.” Jane testified that she had found stable employment, she was completely drug-free, and she had made a complete lifestyle change from when she was using drugs. However, both Tom and Jane maintained that they should be the primary caregiver for Catherine. At the end of the hearing, the chancellor *765 remarked about the significant changes in the cooperation and attitude of the parties and about Jane’s abstention from drugs. Though he praised Jane’s progress, the chancellor still expressed concern over the possibility that Jane could resume drug use and noted that this concern was driving the entire custody issue. The chancellor requested that the parties submit an order with a proposed custodial plan and admonished them to attempt to reach a “middle of the road” agreement that gave both parties significant time with Catherine.
¶ 11. The chancellor signed a Decree for Divorce, submitted to him by Tom’s counsel, on September 26, 2003, nunc pro tunc for June 24, 2003.[2] The decree named Tom as Catherine’s “father-in-fact,” awarded the parties joint legal custody of Catherine, awarded Tom sole physical custody of Catherine, awarded Jane “reasonable and full visitation,”[3] ordered Jane to pay $240 per month in child support, ordered Jane to add Catherine to her medical insurance policy that was provided to her through her employment, ordered each party to pay one half of Jane’s schooling at Tunica Institute of Learning (T.I.L.), and required Jane to submit to random drug testing twice a year upon written notice by Tom.
¶ 12. Jane filed a Motion for New Trial on October 7, 2003. In the motion, Jane alleged that there were several errors in the court’s decree that ran counter to prior testimony and the chancellor’s instructions at the final hearing. She also filed a Request for Findings of Facts and Conclusions of Law because the Decree for Divorce made no specific findings under the Albright factors. The chancellor issued a Revised Decree for Divorce and denied Jane’s motion for a new trial, both of which were entered on May 17, 2004. The revised decree added findings of fact and conclusions of law, yet the disposition of the decree remained the same as the first Decree for Divorce. Jane later filed an Amended Motion for New Trial and/or Amendment of Judgment, which was denied. Jane timely filed her notice of appeal on February 3, 2005. On appeal, Jane alleges the trial court erred by: (1) establishing the doctrine of equitable fatherhood in Mississippi law, (2) not doing an on-the-record analysis of the Albright factors, (3) wrongfully choosing one Al-bright factor over the others to find fault with the appellant, (4) misapplying various sections of the Albright factors, and (5) awarding two hundred forty dollars per month child support, health insurance, and one half the cost of private school tuition.
DISCUSSION
¶ 13. This Court conducts a limited review in child custody cases, and “[a] chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse.” Johnson v. Gray, 859 So.2d 1006, 1012 (Miss.2003).
I. Equitable Fatherhood Doctrine.
¶ 14. Jane argues that the trial court erred in ruling that the doctrine of equitable fatherhood, previously unknown in this state, is applicable to the present case and in using this doctrine as his basis for awarding physical custody of Catherine *766 to Tom. Tom notes that his paternity of Catherine was not called into question until Catherine was six-years old and the parties were almost a year into the divorce proceedings and argues that the chancellor’s adjudication that he is Catherine’s “equitable father” should remain undisturbed.
¶ 15. Jane initially apprised the chancellor that Tom may not be Catherine’s natural father on October 28, 2002, the morning their divorce trial was to begin. Tom and Jane subsequently agreed to have a paternity test conducted, the results of which showed that Tom was not Catherine’s biological father. The chancellor later held a hearing on Jane’s petition to terminate Tom’s parental rights. At the end of the hearing, the chancellor ruled it was in Catherine’s best interests to “remain the child of these two parents forever and ever” and declared Tom to be Catherine’s father despite the fact that he is not her biological father, stating “my ruling is going to be that Mr. [Morgan] is the father in fact — either equitably through judicial adoption of some sort, or through judicial estoppel on the part of anyone complaining about it.” The chancellor more fully articulated this finding in the Revised Decree for Divorce.
¶ 16. In the revised decree, the chancellor noted that Catherine was born on June 21, 1996, while Tom and Jane were legally married, Tom was listed as Catherine’s father on her birth certifícate, Tom’s paternity was never called into question until October 28, 2002, and Catherine has been in Tom’s custody by court order since July of 2002. The chancellor also noted that the man whom Jane has alleged to be Catherine’s natural father, Nick Harrison, testified before the court that he was unaware if he were Catherine’s father but that even if he were adjudicated to be her father, he was not interested in custody, visitation or any relationship with her. Additionally, the chancellor found that Tom was the only father Catherine had ever known, Jane had encouraged the relationship between Tom and Catherine, and Jane had failed to raise the issue of Catherine’s paternity in earlier court hearings on temporary custody.
¶ 17. The Chancellor used these factual findings as the predicate for his determination that Mississippi should now adopt the equitable fatherhood doctrine. Though he cited cases from several jurisdictions, the chancellor relied most heavily on an Iowa case, Gallagher v. Gallagher, 539 N.W.2d 479 (Iowa 1995), as the basis for his ruling.[4] In Gallagher, the husband filed for divorce, and the wife sought an adjudication that the husband was not the *767 father of a child conceived and born during the marriage and to have the husband’s parental rights terminated. Gallagher, 539 N.W.2d at 480. The trial court ruled that because the husband was neither the biological nor adoptive father of the child at issue, he had no parental rights. The Supreme Court of Iowa granted the husband’s interlocutory appeal and ruled that Iowa would now recognize equitable fatherhood, finding:
we believe equitable parenthood may be established in a proper case by a father who establishes all the following: (1) he was married to the mother when the child is conceived and born; (2) he reasonably believes he is the child’s father; (3) he establishes a parental relationship with the child; and (4) shows that judicial recognition of the relationship is in the child’s best interest.
Id. at 481. The Gallagher Court noted that its adoption of equitable parenthood was consistent with principles of equitable estoppel and that all four elements of equitable estoppel were apparent in that particular case.[5] Id. at 481-82.
¶ 18. The chancellor specifically adopted the reasoning in Gallagher as the basis for his decision to establish Tom as the equitable father of Catherine, stating:
This Court adopts the view of the Gallagher Court that, if a Husband were married to the wife when the child was conceived and born; Husband believes that he is Child’s father; a parent/child relationship is fostered; and shows that it is in the child’s best interest for a judicial determination of the relationship, then the courts should recognize an equitable parenthood.
The chancellor conceded that, unlike the child in Gallagher, Catherine was not conceived . during her parents’ marriage but held this factual difference to be of no consequence since Catherine was born after her parents were married.
¶ 19. In finding that the law of Gallagher should be extended to Mississippi to establish equitable fatherhood, the chancellor distinguished the instant factual situation from the scenarios in two prior Mississippi cases which he found were not controlling here. The chancellor invoked the eases of W.H.W., Jr. v. J.J., 735 So.2d 990 (Miss.1999) and Rafferty v. Perkins, 757 So.2d 992 (Miss.2000). In each of those cases, this Court ruled that a “putative father ‘has the legal right to attempt to overcome the rebuttable presumption’ that the [presumed father] is the father of the child in question.” Rafferty, 757 So.2d at 995 (quoting W.H.W., 735 So.2d at 992). The chancellor reasoned that because there is no putative father seeking to have his paternity established in the instant ease, as there was in W.H.W. and Rafferty, and because Tom has maintained a parent-child relationship with Catherine for her entire life, and wishes to continue that relationship, Jane should not be allowed to pursue a course of action that would disestablish Tom’s paternity and essentially bastardize Catherine.
¶ 20. Jane argues that the chancellor’s decision completely ignores Mississippi law, as this Court has established that the doctrine of “in loco parentis” controls in child custody actions where a third party seeks to gain custody over a natural parent. As support for her argument, Jane cites to Sellers v. Sellers, 638 So.2d 481, *768 484 (Miss.1994), where this Court articulated the standard for making a custody determination in situations involving a natural parent and a third party. In Sellers, this Court stated as follows:
In custody battles involving a natural parent and a third party, it is presumed that a child’s best interest will be served by placement in the custody of his or her natural parent, as against any third party. In order to overcome this presumption there must be a clear showing that the natural parent has 1) abandoned the child; 2) the conduct of the parent is so immoral as to be detrimental to the child; or 3) that the parent is unfit mentally or otherwise to have custody.
Sellers, 638 So.2d at 484 (citing Keely v. Keely, 495 So.2d 452, 453 (Miss.1986)). See also In re V.R., 725 So.2d 241, 246-47 (Miss.1998) (finding that in custody dispute between natural parent and third party, natural parent presumption can only be overcome by clear showing of a statutorily defined reason why parent should not retain custody). In Sellers, this Court reversed a chancellor who had awarded custody of a child to a maternal aunt over the natural father without making a finding that the father was clearly unfit to assume custody of the child. Sellers, 638 So.2d at 487. We noted in Sellers that while the chancellor correctly considered several issues in reaching his custody decision, a consideration such as separating siblings “may not be used as a basis to deprive a parent of his child in favor of a third party unless the parent has been found unfit.” Id. at 485.
¶ 21. Because the chancellor found that Tom is not Catherine’s natural father based on genetic testing, Jane would have us declare Tom to be a third party to the custody dispute under Sellers and find that Tom can only obtain custody of Catherine upon a specific finding that Jane has either abandoned Catherine, her conduct is so immoral as to be detrimental to Catherine, or she is mentally or otherwise unfit for custody. We find the instant situation distinguishable from the cases on which Jane relies and note that the third parties seeking custody in Sellers and Keely were an aunt and a grandfather, respectively, whereas Tom has been Catherine’s “legal father” since her birth. Thus, he has existing legal rights and obligations that the third parties in Sellers and Keely did not. Based on this fact (and others articulated below), we find our recent decision in Griffith v. Pell, 881 So.2d 184 (Miss.2004), which was handed down after the chancel-' lor’s revised decree was entered, to be controlling in the instant case, rather than the cases relied on by the chancellor or either party.
¶ 22. In Pell, a husband brought a divorce action against his wife. When she became pregnant about a year after the divorce proceedings began, the husband suspected he was not the father of the couple’s first child, born prior to their marriage, and he sought a paternity test. Pell, 881 So.2d at 185. Genetic testing proved that the husband was not the biological father of the subject child, and the chancellor later granted the wife’s motion for partial summary judgment, ruling that the husband had no legal standing to pursue custody. Id. The wife then filed a motion to terminate the husband’s visitation rights with the child, and the final divorce decree did not grant the father any visitation. Id. The wife then filed a separate paternity action against Griffith, and she and Griffith entered an agreed order declaring Griffith to be the child’s biological father and ordering child support. Id. Griffith and the husband filed a motion seeking to declare the husband to be the child’s legal father, with Griffith agreeing to relinquish his parental rights and allow *769 the husband to adopt the child. Id. The chancellor, however, denied the motion, set child support payments and awarded Griffith visitation rights. Id. Both actions were appealed; the Court of Appeals affirmed both decisions; and this Court consolidated the appeals on writs of certiorari. Id.
¶ 23. This Court disagreed with the chancellor’s holding that the adjudication of Griffith as the child’s biological father in the paternity proceedings foreclosed the husband from having any rights of custody or visitation regarding the child. Id. at 186. We stated that “[mjerely because another man was determined to be the minor child’s biological father does not automatically negate the father-daughter relationship held by [the husband] and the minor child,” and pointed out that in Logan v. Logan, 730 So.2d 1124 (Miss.1998), this Court held that, under the facts of that particular case, the stepfather should be awarded custody of the child in a divorce action between the stepfather and the child’s biological mother. Id. In Pell, we reaffirmed the “in loco parentis” doctrine [6] and found a portion of Logan’s holding to be controlling in the instant case, specifically finding:
[w]here a stepfather, as an incident to a new marriage, has agreed to support the children of a previous marriage, or where he does so over a period of time and the mother and the children in good faith rely to their, detriment on that support, the best interests of the children require entry of a child support decree against the stepfather. Thus, it folloivs that if a stepparent can be required to pay child support for a stepchild based on his support of the stepchild over a period of time, where it is in the best interests of the child, he should be allowed to have custody of the stepchild based on the affection for and support of that child over a period of time. With the burden should go the benefit.
Id. at 186 (emphasis in original). We reasoned in Pell that because the husband “may be required to pay child support” under Logan, because of his continued support and care for the child and the wife and child’s previous reliance on that support, “[i]t therefore follows that he may be awarded custody and/or visitation rights with the minor child.” Id. Based on this reasoning, we reversed the chancellor’s termination of the husband’s parental rights in Pell and remanded the case for a determination of custody, support and visitation issues in light of the best interests of the child. Id. at 187.
¶ 24. In the instant case, Tom was established as Catherine Morgan’s legal father at the time of her birth (as his name appears on her birth certificate) and has supported her under that assumption without challenge for several years. Because Tom is Catherine’s legal father, he has legal rights and obligations which cannot be compromised without sufficient cause. Also, Catherine and Jane have continually relied on the support that Tom has provided for Catherine, and the record reflects that Tom and Catherine have established a strong father-daughter relationship.
¶ 25. These facts bring this case squarely within our holding in Pell; we, therefore find the chancellor did not abuse *770 his discretion in awarding custody to Tom, despite his reliance on an equitable fatherhood doctrine. Furthermore, we note that there is no putative father in this case seeking to be recognized as Catherine’s father, as there was in Rafferty. Because Catherine’s biological father has not been conclusively established and no man is seeking to fill Tom’s role as Catherine’s father, disestablishing Tom as Catherine’s father would require Jane, DHS, and the court system to expend additional time and resources in an effort to establish another man as Catherine’s father, without any guarantee that such an individual would pay child support or attempt to establish a father-daughter relationship with Catherine. Such a result is not likely to be in Catherine’s best interests.
¶ 26. We decline to adopt the “equitable fatherhood” doctrine upon which the chancellor based his custody ruling in favor of Tom. We do, however, uphold the chancellor’s finding that Tom is Catherine’s “father in fact” and is thus entitled to rights of custody, visitation, and the like, as this finding comports with our decision in Pell. Therefore, we affirm the chancellor as to this issue.
II. On the Record Analysis of the Albright Factors.
¶ 27. Jane argues that the chancellor did not make an on-the-record analysis of the Albright[7] factors and that his failure to do so constitutes reversible error. See Powell v. Ayars, 792 So.2d 240, 244 (Miss.2001) (remanding case to chancellor for failure to make findings on each applicable Albright factor). Jane notes that the chancellor did not read into the record his reasoning under Albright for awarding custody to Tom. She argues that the chancellor’s articulation of the Albright factors in the Revised Decree for Divorce is not sufficient to be considered an “on-the-record” finding and that even if this Court determines the chancellor’s written findings were made on-the-record, he did not provide a legally sufficient analysis of each factor, as this Court has mandated in Powell and subsequent cases.
¶ 28. Although the initial Decree for Divorce, which was prepared by Tom’s counsel, did not make specific factual findings under Albright, the revised decree did. The revised decree specifically listed each of the applicable Albright factors, noted the facts which applied to each factor, and stated whether a particular factor weighed in favor of Tom, Jane, or neither party. We find that the chancellor’s written findings in the Revised Decree for Divorce are sufficient to constitute an “on-the-record” finding and Jane’s argument is wholly without merit and borders on a frivolous claim.
III. Over-reliance on One Particular Albright Factor.
¶ 29. Jane also contends the chancellor weighted one Albright factor more heavily than the others and unfairly used it against her to award custody to Tom. Though she alleges the chancellor gave too much weight to one “factor,” her argument is essentially that the chancellor based his decision entirely on her prior use of illegal drugs, though testimony in later proceedings indicated she was no longer using drugs. Her contention that the chancellor only considered her drug use is based largely on a comment the chancellor made in the temporary hearing of July 17, 2002, when he stated that Jane’s drug use could “trump all the other Albright factors,” even though the final judgment reflects the chancellor’s consideration of additional evidence introduced in subsequent hear- *771 mgs. She contends that Albright itself prohibits a chancellor from giving more weight to any particular factor. See Albright, 437 So.2d at 1005 (“Age should carry no greater weight than other factors to be considered.... ”)• She also cites to Hollon v. Hollon, 784 So.2d 943, 952 (Miss.2001), where we reversed a chancellor’s grant of custody to the natural father because that custody determination was based almost solely on the moral fitness factor. In Hollon, we found that the chancellor placed too much emphasis on the wife’s alleged homosexual affair to the exclusion of the other evidence which clearly showed that the wife should have been granted custody. Hollon, 784 So.2d at 952.
¶ 30. Hollon, however, is clearly distinguishable from the case at bar. In Hollon, this Court found that the evidence clearly favored the wife and that the chancellor failed to make a specific ruling as to which parent, if either, was the favored parent under most of the Albright factors, and the husband even admitted that his only concern about the wife retaining custody was his fear that his son would be raised in a homosexual environment. Id. In the present case, the chancellor made a specific finding as to whether Tom or Jane or neither of the two was the favored parent under each factor. The chancellor did reference Jane’s drug use under the “physical and mental health and age” factor and found that this factor weighed heavily in Tom’s favor, yet his ultimate determination that Tom was more fit to retain custody was not based on this finding alone. The chancellor found for Tom on six of the nine Albright factors, noting that he had a more stable employment history, provided a more stable home environment which was reflective of his parenting skills, and that he was more morally fit than Jane.
¶ 31. While Jane’s drug use may have weighed into each individual finding, the evidence clearly showed that her previous drug use affected several different aspects of her life. We find that the chancellor did not unfairly weigh Jane’s prior illegal drug use against her to the exclusion of other evidence, as the evidence introduced at trial reflected that Tom clearly made better decisions concerning the care and upbringing of Catherine than Jane. The chancellor properly considered the poor decisions Jane made as a result of drug use, rather than the drug use itself, in making his findings under Albright, and Jane’s allegation of error as to this issue is without merit.
IV. Application of the Albright Factors.

1. Health, Age and Sex of the Child.

¶ 32. Regarding this factor, the chancellor found Catherine to be a healthy seven-year-old girl with no history of medical problems, she was of an age and maturity level that either parent could care for her, and found that this factor favored neither parent. Jane argues the chancellor erred in failing to find that this factor weighed in her favor. As support for this argument, she cites to Sobieske v. Preslar, 755 So.2d 410, 413 (Miss.2000), where this Court found that the age and sex of the child weighed in favor of the mother retaining primary custody, as the child was a female and was between four or five years old at the time the custody modification action was commenced. In Sobieske, we did find that the age and sex of the child weighed in favor of the mother, but we also noted that the tender years doctrine has been weakened in Mississippi to the point that age and, sex are now merely factors to be considered under Albright. Sobieske, 755 So.2d at 413.
¶ 33. In Merrier v. Merrier, 717 So.2d 304, 306-07 (Miss.1998), cited in Sobieske, *772 the chancellor found that the age and sex of the child weighed in favor of neither parent where the female child was within weeks of her seventh birthday at the time of trial. On appeal, this Court affirmed the chancellor’s finding and stated that “a child of seven is long past the age that requires this type of special care from her mother.” Mercier, 717 So.2d at 307. In the present case, Catherine was six when the matter initially came to trial and was seven at the time that both the first and revised divorce decrees were entered. Because Catherine was seven years old at the time the chancellor entered the challenged order, we find the chancellor did not abuse his discretion in finding that this factor did not weigh in favor of either parent, i.e., that the tender years doctrine was not applicable.

2. Continuity of Care.

¶ 34. The chancellor’s finding regarding the continuity of care for Catherine is stated as follows:
The Court finds that while both parties cared for the child prior to their separation, Wife was the primary care giver from 1998 until October 2001, with Husband having some visitation. In October of 2001, at Wife’s request, Child began to reside with Husband. On December 12, 2001, this Court ordered that Husband and Wife would each have the child for rotating two week periods. On July 17, 2002, this Court granted temporary custody to Husband with visitation rights granted to Wife. This factor does not favor either parent.
Jane alleges that the chancellor improperly calculated the continuity of care. She testified that Tom was living in the house with her and Catherine for only fifteen months of the first two years and two months of Catherine’s life, that the chancellor failed to take this fact into account, and that this failure led the chancellor to improperly find that the continuity of care factor favored neither parent. Tom, on the other hand, argues that because he is currently Catherine’s primary care giver, and has been for more than three years, the chancellor should have found him to be the favored parent under the continuity of care factor.
¶ 35. The thrust of Jane’s argument seems to be that if one were to calculate the total time that Catherine was in her care versus the total time Catherine was in Tom’s care, Catherine was in her custody for a longer period of time and therefore this factor should weigh in her favor. Jane, however, has cited no authority that the chancellor was required to employ such logic in weighing this particular factor.
¶ 36. The essence of the chancellor’s finding, as it relates to this factor, is that Jane was the primary caregiver for Catherine when she was younger, Jane and Tom each had physical custody of Catherine on a rotating two-week basis from December 12, 2001, to July 17, 2002, and that Tom has been the primary caregiver from July 17, 2002, to the date of his ruling. Therefore, it was reasonable for the chancellor to determine that because there was a distinct period when each parent was the primary care giver and there was a time when both parties equally shared parenting responsibilities, neither party should be favored under this factor. As there was sufficient evidence in the record to support his finding, we find that the chancellor did not abuse his discretion in finding that neither parent was favored as to providing continuity of care.

3. Which Parent Possesses the Best Parenting Skills and Which Has the Willingness and Capacity to Provide Primary Child Care.

¶ 37. Jane alleges that the chancellor erred in finding that Tom was fa *773 vored as the parent who had the best parenting skills and willingness and/or capacity to be the primary care giver for Catherine. The chancellor found that:
[f]rom the evidence and testimony, [Catherine] is well taken care of by Husband and she is kept on a regular daily schedule and routine. Testimony was presented that while residing with Wife, the child was not kept on a regular routine, went to bed at irregular hours, and struggled with her kindergarten work to the point that she was promoted only on the condition that she attend summer .tutoring. The testimony further showed that while residing with Husband, the child has all A’s and B’s, that she is worked with at home with regard to her school work. The Court must find that Husband is favored.
Jane argues that the chancellor failed to consider the fact that she had been Catherine’s primary caregiver from her birth until Tom took Catherine (at her request) in October of 2001. She also claims that the only period in which the care she provided for Catherine was less than ideal was from approximately the fall of 2001 until June of 2002 when she admittedly used drugs. She argues that the chancellor was wrong to base his finding that she was an irresponsible parent solely on events that occurred during one nine-month period of Catherine’s life, when there was no other evidence of problems in Catherine’s life either before or since the short period that Jane admitted using drugs. Jane additionally notes that the chancellor did not address the willingness and capacity of the parties to provide primary car.e for Catherine.
¶ 38. Tom rebuts Jane’s argument by noting that the chancellor’s finding was supported by evidence introduced in open court and argues that the chancellor was correct to base his finding on events during the period that Jane was using drugs, as this evidence tends to show that he was more capable of providing Catherine with a safe, stable environment than Jane.
¶39.' The record supports the chancellor’s finding that Tom keeps Catherine on a daily routine and schedule. Tom testified that Catherine has a regular bed time of 8:30 p.m. during the school year. This testimony was corroborated by Jackie Tucker and Kim Swindoll, who also testified that Catherine is regularly up by 7:00 a.m. when she is with Tom. The chancellor’s finding that Catherine got good grades and had help with her schoolwork when in Tom’s care was based on Tom’s testimony that Catherine concluded her first-grade year with straight A’s and that he helped her study at night. Catherine’s first grade teacher, Kay Hill, also testified as to Catherine making A’s and B’s in her class.
¶ 40. The chancellor also found that when Catherine was with Jane, she did not have a regular routine and struggled in kindergarten. This finding was supported by Catherine’s kindergarten teacher, Laurie Ann Evans, who testified that Catherine struggled during her second semester, she was occasionally late, and she sometimes failed to have her homework .done when Jane brought, her to school. Jackie Tucker, who lived with Jane, for a while after Tom and Jane were separated, testified that although Jane provided care for Catherine, there was drinking, partying, and drug use going on in the house while Catherine was there (though not in front of Catherine).
• ¶ 41. The chancellor’s factual finding that Tom provided a more stable environment was supported by credible evidence in the record. Jane complains that the chancellor discounted the care she provided to Catherine prior to using drugs and the strides she has made in her personal *774 life since abstaining from drug use. While we note that Jane’s efforts to reform were admirable, we find the chancellor did not abuse his discretion in making this finding. As this Court has repeatedly stated, it will not disturb a chancellor’s factual findings unless they are “manifestly wrong, clearly erroneous or the chancellor abused his discretion.” Hollon, 784 So.2d at 946.

⅛,. Employment of Each Parent and the Responsibilities of Each Parent.

¶ 42. Concerning the employment of each parent, the chancellor found as follows:
The Court heard that Husband has been a certified licensed plumber since 1993, and has been employed with [Morgan] Plumbing for over three (3) years. His regular hours are 7:00 a.m. to 6:00 p.m., but he has some flexibility if he needs to take off. The Court was presented with evidence that Wife has had several jobs with the last being a self-employed painter and employee at Park Place Entertainment for the past several months. She was not employed fore [sic] several months between 2001 and 2002. The Court must weigh this factor for Husband.
The chancellor’s findings regarding Tom’s employment were based on Tom’s own testimony. Jane argues that the chancellor erred in making this finding because Tom was not actually a licensed plumber. She sought to raise this supposed error in her Amended Motion for New Trial and/or Amendment of Judgment via an attached letter from a Tunica County Permit Clerk, which indicated that Tom had not been licensed as a plumber in Tunica County since February 2000. The chancellor denied Jane’s motion, ruling that the evidence she sought to introduce was available at the time of trial, that the evidence at trial established that Tom worked as a plumber, and that the Revised Decree for Divorce would remain undisturbed. Jane now complains that because Tom did not testify about his licensure until the last day of trial, she did not have ample opportunity to go to the clerk’s office and retrieve the records to impeach him.
¶ 43. Jane essentially seeks to create an issue where there is none. While the chancellor’s finding may be incorrect regarding Tom being licensed, given that there is at least some post-trial evidence casting doubt on Tom’s licensure as a plumber, the testimony at trial still shows that Tom has maintained a steady job with regular hours for the last three plus years, which is clearly what the chancellor found to be most relevant.
¶ 44. Jane also contends that the chancellor erred in finding that she was unemployed for several months, claiming that the testimony does not support such a finding. During the July 17, 2002 hearing, Jane testified that she was self-employed as a painter, she restored furniture, and she would be working as a guide during the upcoming hunting season. At that same hearing, Jackie Tucker testified that Jane had previously lost her job at the WIC center, although she claimed that she quit so she could spend more time with Catherine. She was presumably without employment during the roughly one month’s time that she was in drug rehabilitation during July and August of 2002. At the October 28, 2002 hearing, Jane’s father testified that his daughter had just started working at the Tunica Gin and he did not know how long it had been since she had previously held a job. Jane’s mother testified at the hearing on March 25, 2003, that Jane had been employed most of the time since the summer of 2002, after she left rehabilitation. She also testified at that same hearing that she was not aware of Jane presently being employed anywhere, *775 she had worked at Tunica Gin until December of 2002, and she had done some furniture refinishing for various people. At the hearing on June 24, 2003, Jane testified that she was currently working for Park Place Entertainment and had been there for almost three months. She also testified that she had been unemployed prior to getting the job with Park Place, she had previously worked at the Tunica Gin, but was unaware of how long she had been unemployed prior to starting her current job. She also admitted there had been periods of time in the past when she was not drawing an income of any kind.
¶ 45. While the evidence may not have shown she was without any employment for months at a time, the testimony from the various hearings does show that Jane held jobs sporadically, often on a seasonal basis only, and that she had gone through periods when she had no income at all. The chancellor heard this testimony and determined that Tom’s work situation was more stable than that of Jane, who as of the date of the final hearing, had been in her current job less than three months. We find that Tom clearly had more stability in his employment; this was reflected in the chancellor’s finding; and he did not abuse his discretion in finding Tom to be the favored parent under this Albright factor.

5. Physical and Mental Health of Each Parent.

¶ 46. Regarding the parents’ mental and physical health, the chancellor found that Jane had tested positive for amphetamines, admitted to smoking and injecting methamphetamines, was admitted to drug rehabilitation, and had failed two of three drug tests that she had taken. He found that Tom had gone to treatment for alcohol addiction and depression following his father’s death but did not presently have a drinking disorder.
¶ 47. Jane claims the chancellor’s finding was made in error because she had failed only one drug test that was admitted into evidence. She acknowledges that she failed a drug test in June of 2002, the results of which were admitted into evidence. She admits that other drug tests were performed; however, she notes that the results were never made part of the record and argues that the chancellor should not have used those tests or their results to rule against her. Both of Jane’s parents testified on March 25, 2003, that Jane had recently taken a drug test administered by Methodist Family Health Center and that they were aware of the results, but neither testified directly as to what those results were.
¶ 48. We find that it was improper for the chancellor to state in his factual findings that Jane failed two of her previous three drug tests when that evidence is not in the record. Were this a jury trial, any information regarding the results of a drug test would have to be introduced either through testimony or documentary evidence. Nothing in the record before this Court proves that Jane failed a second drug test. Notwithstanding that fact, we find the chancellor did not err in making his ultimate finding that Tom was the favored parent under this particular Albright factor. Jane has challenged none of the other facts in the chancellor’s finding, and the record clearly reflects that Jane had a substance abuse problem. Though she maintains that she is now drug free, and has been for some time, the chancellor was within his discretion in considering her prior conduct to determine that Tom was the favored parent concerning the physical and mental health and age of the parents.

*776
6. Emotional Ties of Parent and Child.

¶ 49. Jane does not challenge the chancellor’s finding under this factor, which stated that both parents have strong bonds to Catherine and that neither party was favored.

7. Moral Fitness of Parents.

¶ 50. The chancellor’s finding concerning the moral fitness of the parties is as follows:
There was no evidence that Mr. [Morgan] had been convicted of any crimes or felonies. There was evidence that he attended ■ church, attended work every day, and that he was responsible. There was no evidence regarding Ms. [Morgan’s] attending church, but Wife’s mother testified that Wife was keeping company with individuals, of whom Wife’s mother did not approve, at all hours of the night. Further there was evidence that Wife had friends and left Child with individuals which, by her own testimony, used illegal drugs. This factor favors Mr. [Morgan].
Jane contends that the chancellor was flatly wrong in finding there was no evidence that she attended church. She testified on June 24, 2003, that she attended First Baptist Church and had taken Catherine to church the last Sunday that Catherine was in her care. The chancellor’s finding that Jane did not attend church is clearly contrary to the evidence introduced at trial.
¶ 51. Jane concedes there was sufficient evidence for the chancellor to find that she had friends who used drugs and that she left Catherine in the care of people who used drugs; however, she argues that the time period encompassing those findings was relatively brief (roughly nine months) and that this finding is unfair or inaccurate in fight of subsequent testimony. She notes that in the final hearing of June 24, 2003, she testified that she no longer had any dealings with a former drug-using friend whom she admittedly let babysit Catherine in the past. Jane also testified at this hearing that she had completely changed “people, places, and things” from the time she was using drugs to the present. While Jane did introduce evidence of the strides she had made from date of the hearing on July 17, 2002, when she had admitted associating with fellow drug users and leaving Catherine in their care, to the final hearing, when she claimed to have put aside those old associations, the chancellor still considered Jane’s prior negative actions in determining that Tom was the more morally fit parent. While Jane may think this unfair, the chancellor clearly has the discretion to weigh these actions in reaching his decision.
¶ 52. Jane also argues that the chancellor was wrong to exclude from his finding on moral fitness the fact that Tom admitted to being in an adulterous relationship with Kim Swindoll, whom he began seeing after the couple’s separation but prior to their divorce. Tom rebuts Jane’s argument that his relationship with Kim should weigh against him, since the testimony revealed that Jane was involved in a relationship with Billy Ray Goff after she and Tom separated. Jane has little ground to argue this point, as she herself was also engaged in the very type of activity which she claims should have weighed against Tom.
¶ 53. While the chancellor erred in finding there was no evidence of Jane attending church, this error is not so egregious as to undermine his ultimate finding that Tom was the more morally fit parent. While Jane testified that she no longer associates with former drug using friends or leaves Catherine in their care, at one time in her fife she had no qualms about *777 leaving Catherine in a house where drug use was common or allowing fellow drug users to babysit her. Such actions exhibit a disregard for the safety and well-being of the child that a chancellor must certainly consider when making a custody determination. While the chancellor’s finding may reflect a greater consideration of matters from earlier hearings, we reiterate that he is vested with the power to render findings in light of all of the evidence before him. Since his finding as to the moral fitness of the parties neither runs counter to the evidence nor reflects an abuse of discretion, we affirm his finding as to this Albright factor.

8. The Home, School, and Community Record of the Child.

¶ 54. The chancellor found Tom to be the favored parent under this factor, relying on the same reasoning he employed under the parenting skills factor. Because Jane has offered no new argument on this factor, we rely on our analysis regarding parenting skills (see factor three, supra), and affirm the chancellor’s finding that Tom is the favored parent under this factor.

9. Stability of Home Environment, Employment of Each Parent and Other Factors Relevant to Parent Child Relationship.

¶ 55. Jane contends that the chancellor erred in making his finding as to the stability factor by misstating facts and/or overlooking other relevant evidence. She claims that the statement that she lived in three difference residences from 2001 to 2002 is inaccurate. She notes that she testified to living at 1190 Kenny Hill in Tunica from the time she separated from Tom in 1998 until she moved to 1102 Round Street for a period of roughly eight months before moving back to the Kenny Hill address where she has continued to live up to the present time. She claims that these are the only two addresses where she has lived since 2001, yet her assertions are rebutted by Jackie Tucker, who testified at the hearing on July 17, 2002, that Jane had spent a period of time living in Jabbo Beard’s house at the Tunica cut-off. Based on this testimony, the chancellor has sufficient evidence before him to find that Jane did in fact reside at three different addresses during the period in question.
¶ 56. Jane also complains that the chancellor’s finding that “[ujnder the care, of Wife, [Catherine] does not stay with Ms. Connell [a day care provider], but instead the evidence has led this Court to believe that [Catherine] was left with an individual who, by wife’s on [sic] testimony, used illegal drugs” is a mis-characterization of the facts which unfairly caused him to weigh the stability factor in favor of Tom. She admits that the finding is factually correct but argues that the period of time in which she let drug-using friends babysit or take care of Catherine was no more than nine months prior to the July 17, 2002 hearing, and the chancellor’s failure to make mention of the fact that she is currently drug free leaves the unfounded impression that she still leaves Catherine in the care of questionable people. Testimony introduced at the final hearing did reflect that Jane would now leave Catherine with her (Jane’s) father when she had to work and Catherine was- in her custody, she no longer had contact with former drug-using friends, and Tom even admitted that many of his previous concerns regarding Jane’s custodial care of Catherine had subsided. While this additional testimony tends to show that Jane has gotten better since the initial hearing, the record also - reflects that she was using drugs and leaving Catherine with questionable babysitters prior to the nine-month *778 time frame in which she has admitted to drug use. Jackie Tucker testified on October 28, 2002, that Jane was using drugs in June of 2000 when he returned to Tunica from boot camp and that Catherine was left at Jane’s house with her drug using friends at that time. Despite Jane’s protestations to the contrary, the evidence before the chancellor is sufficient to find that Tom has provided a more stable environment for Catherine than Jane.
¶ 57. Jane also takes issue with the chancellor’s finding under this Albright factor because the chancellor made no mention of how extended family affected the stability in Catherine’s life. She points out that Tom has no extended family close by, as both of Tom’s parents are dead and his stepmother lives in Texas. On the other hand, the testimony clearly reflected that Jane’s parents lived in Tunica and were involved in both Jane’s and Catherine’s lives, especially when Catherine was in Jane’s custody. She contends that this is pertinent information that the chancellor should have considered in weighing this factor because “the presence of extended family is a legitimate factor to support awarding custody to a parent.” See Messer v. Messer, 850 So.2d 161, 167 (Miss.Ct.App.2003).
¶ 58. While this information may have been pertinent to the chancellor’s analysis, his failure to include it in his findings does not undermine his ultimate finding as to which parent provides a more stable environment for Catherine. As the evidence shows, Tom has lived at the same address and been employed in the same job since he returned to Mississippi in 2001. He has had custody of Catherine from the fall of 2001 until the present, except for a seven-month period when he and Jane had custody of Catherine on an alternating two-week basis. Tom has also dated the same girlfriend, Kim Swindoll, from the time of the initial hearing until the present time, and the two have plans to marry. Though the fact that Jane’s parents live in Tunica and are willing and able to help support both Jane and Catherine may weigh in her favor, there is more than ample evidence in the record to support the chancellor’s finding that Tom can provide a more stable home environment for Catherine. Therefore, we find that the chancellor did not abuse his discretion in making this finding.
¶ 59. Regarding the above Albright analysis, Jane has introduced some evidence to show that the chancellor may have erred in making some of his individual factual determinations. However, we find that the chancellor’s ultimate findings under each Albright factor are supported by credible evidence in the record, so his decision to award Tom physical custody of Catherine does not reflect an abuse of discretion and must be affirmed.
V. The Propriety of the Chancellor’s Award of $240 per Month Child Support, Health Insurance, and One Half the Cost of Private School Tuition.
¶ 60. Jane was ordered to pay $240 per month in child support, to add Catherine to her employer-provided health insurance plans, to pay one-half of any uncovered medical expenses, and to pay one-half of the tuition and expenses for sending Catherine to T.I.L. She argues that this award was made in error because the $240 per month child support award exceeds the 14% statutory figure, in light of her testimony that she made roughly $1,600 per month, as 14% of $1,600 yields a figure of $224. She also claims it is unfair to make her pay one-half of the costs associated with sending Catherine to T.I.L. because adding those costs to the *779 $240 per month in child support easily constitutes one-half of her monthly income.
¶ 61. While Jane complains about the amount of money that the chancellor has required her to pay to help support Catherine, she has failed to cite any case law or statutory authority to show just how the chancellor erred in making his ruling. As Jane has failed to cite any authority, let alone any relevant authority, we find that Jane is procedurally barred from raising this issue on appeal. See Touchstone v. Touchstone, 682 So.2d 374, 380 (Miss.1996); Ellis v. Ellis, 651 So.2d 1068, 1073 (Miss.1995) (procedurally barring appellant from having merits of issue considered on appeal for failure to cite to any authority).
CONCLUSION
¶ 62. We find that the chancellor did not abuse his discretion in determining that Tom is Catherine’s father, in finding that Tom was the more fit parent to retain primary custody of Catherine under Al-bright, or in rendering the child support award. Therefore, we affirm the Tunica County Chancery Court’s'Revised Decree for Divorce.
¶ 63. AFFIRMED.
SMITH, C.J., WALLER, P.J., DIAZ, CARLSON AND DICKINSON, JJ., CONCUR. COBB, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY DICKINSON, J.; RANDOLPH, J., JOINS IN PART. EASLEY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY RANDOLPH, J. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY DICKINSON, J.; COBB, P.J., JOINS IN PART.

. Due to the sensitive nature of this case, we have assigned pseudonyms to the parties and the minor child in this case.

. Tom's counsel signed the decree as being in agreement to its form, but Jane’s counsel did not sign as agreeing to the form of the decree.

. The order awarded Jane eight weeks of visitation during the summer, weekend visitation every other weekend, visitation on Thanksgiving every other year, roughly one week of visitation during Christmas holidays, visitation on Mother’s Day, and other visitation upon agreement of the parties.

. Other cases cited by the chancellor include Hodge v. Hodge, 84 Or.App. 62, 733 P.2d 458, 459 (1987) (estopping wife from raising question of whether husband is biological father of child as basis to prevent him from obtaining custody); Doe v. Doe, 99 Hawai'i 1, 52 P.3d 255, 267 (2002) (collaterally estopping mother from bringing action against alleged father to establish paternity under state statute); In re Marriage of Worcester, 192 Ariz. 24, 960 P.2d 624, 626 (1998) (holding wife not entitled to relief from final judgment on divorce decree because she intentionally misrepresented facts under oath regarding child's parentage); Ohning v. Driskill, 739 N.E.2d 161, 164 (Ind.Ct.App.2000) (judicially estopping wife from attacking validity of divorce decree which acknowledged husband as child’s father); Rubright v. Arnold, 973 P.2d 580, 584 (Alaska 1999) (recognizing that in an appropriate case a mother may be equitably estopped from denying paternity); Ex Parte Presse, 554 So.2d 406 (Ala.1989) (noting that wife barred under res judicata from bringing paternity action when she was party to original divorce and custody judgments); Atkinson v. Atkinson, 160 Mich.App. 601, 408 N.W.2d 516, 519 (1987) (holding that even though wife may establish non-paternity of husband in divorce action, husband may still acquire parental rights under "equitable parent” theory).

. The Gallagher Court stated that the elements of equitable estoppel are: (1) a false representation or concealment of a material fact; (2) a lack of knowledge of the true facts on the part of the actor; (3) the intention that the representation or concealment be acted upon; and (4) reliance thereon by the party to whom it is made, to his or her prejudice and injury. Gallagher, 539 N.W.2d at 482.

. "Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child is said to stand [in loco parentis].” Pell, 881 So.2d at 186 n. 1 (citations omitted). If the natural parents are found unsuitable to retain custody, "it is the duty and responsibility of the court to find a suitable home and suitable adults to stand in loco parentis.” Logan, 730 So.2d at 1126 (citations omitted).

. Albright v. Albright, 437 So.2d 1003 (Miss. 1983).