. BARNES, J.,
concurring in part and dissenting in part:
¶ 39. T concur with the majority’s finding that the chancellor had jurisdiction. However, I Cannot accept the majority’s characterization of Daniel’s position as comparable to the “unique” factual situations in Griffith v. Pell 881 So.2d 184 (Miss.2004), and J.P.M. v. T.D.M., 932 So.2d 760 (Miss.2006). Accordingly, T dissent.
I. The Chancery Court’s Lack of Authority to Grant Daniel Physical Custody of Justice
¶ 40. As noted by the majority, there is no dispute that Daniel was acting in loco parentis. While the doctrine of in loco parentis “grants third parties certain parental rights,” our supreme court has emphasized that “such rights are inferior to those of a natural parent.” Davis v. Vaughn, 126 So.3d 33, 37 (¶ 12) (Miss.2013); see also In re Adoption of Wright, 160 So.3d 737, 741 (¶ 11) (Miss.Ct.App.2015) (“Our law clearly has a strong presumption that a natural parent’s right to custody is superior to that of third parties, whether grandparents or others.” (quoting Grant v. Martin, 757 So.2d 264, 266 (¶ 9) (Miss.2000))). “[I]t is presumed that it is in the best interest of a child to remain with the . natural parent as opposed to a third party.” Davis, 126 So.3d at 37 (¶ 10) (citation omitted). This presumption “may be rebutted by clear and convincing evidence that ‘(1) the parent has abandoned the child; (2) the parent has .deserted the child; (3) the parent’s conduct is so immoral as to be detrimental to the child; or (4) 'the parent is unfit, mentally or otherwise, to have custody.’” Id (quoting Smith v. Smith, 97 So.3d 43, 46 (¶ 9) (Miss.2012)).
In a custody case involving a natural parent and a third party, the court must first determine whether through abandonment, desertion, or other acts demonstrating unfitness to raise a child, as shown by clear and convincing evidence, the natural parent has relinquished his right to claim the benefit of the natural-parent presumption. If the court finds one of these factors has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the Albright factors.
In re Dissolution of Marriage of Leverock & Hamby, 23 So.3d 424, 431 (¶ 24) (Miss.2009). Thus, “in a custody dispute be *751 tween, one standing in loco parentis and a natural parent, the parent is entitled to custody unless the natural-parent presumption is rebutted.” Davis, 126 So.3d at 37 (¶ 10) (emphasis added) (citing Smith, 97 So.3d at 46-47).
¶ 41. To support his ruling, the chancellor primarily relied on In re V.D.W., 152 So.3d 336, 341-42 (¶¶ 28-30) (Miss.Ct.App.2013), a case in which this Court reversed the chancery court’s award of custody to the natural mother and held that, because the stepfather had taken care of the child and treated her as his own, and" “share[d] equal custody time and expenses” with the natural mother, he “had overcome the natural-parent presumption.” However, when the chancellor made his custody determination in this case, V.D.W. was pending before the supreme court on a petition for certiorari. On June 12, 2014, the petition was granted, and'the supreme court subsequently overturned our holding, finding that this Court’s position — that the stepfather’s “positive, supportive, fatherly actions operated to rebut the natural-parent presumption and placed [the father acting in loco parentis ] on equal footing with [the mother] and [biological father] for purposes of an Albright analysis” — was not “congruent with the present state of the law.” In re Waites, 152 So.3d 306, 313 (¶ 17) (Miss.2014). The supreme court held that the chancellor’s ruling — that the natural mother should have full legal and physical custody and that the stepfather faded to prove the natural parents were “unfit” — was “correct, given the controlling law[.]” Id. at 309, 314 (¶¶8,-20). The court stated that, “[u]nder the present state of the law, in the absence of rebutting the .natural-parent presumption via clear and convincing evidence of abandonment, desertion, immoral conduct detrimental to the child, and/or unfitness, ‘the court may not consider granting custody to a third party, including one standing in loco parentis.’ ” Id. at 314 (if 19) (quoting Davis, 126 So.3d at 37 (112)). Thus, “a third party’s in loco parentis status, standing alone, [cannot] rebut the natural-parent presumption.” Id. at 311 (¶ 14) (citing Davis, 126 So.3d at 37 (¶ 12)).
¶42. However, citing Pell, 881 So.2d 184, and J.P.M., 932 So.2d 760, the majority finds that the “unique facts” of this case are sufficient to rebut the natural-parent presumption, referencing the child’s belief that Daniel was her father and emphasizing the biological father’s absence.[11] I find those cases are clearly distinguishable from the present circumstances. Pell and J.P.M. involved fathers who believed they were the biological fathers of the children at issue and had raised the child under that assumption.[12] As noted Dean Bell’s treatise, Beil on Mississippi Family Law, “[t]he [supreme] court [has] distinguished the •‘defrauded father’ cases in which a husband was granted custody of a child whom he believed to be his. In those cases, the father’s in loco parentis status was only one of the factors considered.” Deborah H. Bell, Bell on Mississippi Family Law § 12.06(2) at 77 (Supp.2013) (citing Smith, 97 So.3d at 48 (¶ 11)). These are not the facts before us in this case. This is not a “defrauded- father” case; Daniel knew Justice was not his *752 daughter before his marriage to Sabrina, and he admitted that he never attempted to adopt Justice.[13]
¶ 43. Furthermore, in Pell, the supreme court merely established that the stepfather “may be required to pay child support” and “may be awarded custody and/or visitation rights,” and there was no discussion of the natural-parent presumption. Pell, 881 So.2d at 186 (¶ 8). In a special concurrence to J.P.M., Justice Cobb remarked:
[A] person standing in loco parentis has the rights of a parent as against the entire world, except the natural parents. In Pell, that standard was changed, without analysis, to apply against the child’s natural mother and in favor of what is in reality a third party. The change in Pell tore in loco parentis from its original moorings. In loco parentis was never meant to be used against the natural parent as it is in this case and in Pell. Rather, the doctrine was intended to protect third parties, who assume custody and care of a child whose natural parents are absent or unable to care for it, from losing the child to other third parties including the State.... This Court has twisted the meaning of in loco parentis and is now using it in a way that is clearly unwarranted by our precedent.
J.P.M., 932 So.2d at 781 (¶¶ 73, 75) (Cobb, P.J., specially concurring). In J.P.M., the supreme court did uphold the chancellor’s finding that the stepfather should have physical custody of the minor child. However, in that case, the stepfather was considered to be the child’s legal father on her birth certificate, id, at 766 (¶ 16) (majority opinion), and the chancery court had expressed concern that the natural mother, who had a history of drug use, might relapse. Id. at 765 (¶ 10). There was no putative father seeking custody; in fact, the child’s “biological father ha[d] not been conclusively established!.]” Id. at 770 (¶25). Therefore, the circumstances fell within those addressed by Justice Cobb in her special concurrence — the third party, acting in loco parentis, was given custody, as neither natural parent was determined to be willing or able to care properly for the child.
¶44. Again, those are not the facts before us. I find the majority’s constant emphasis on the fact that Justice’s biological father is absent to be a “red herring.” While the natural father was brought in as a party in the proceedings below, he never made an appearance, and this case has, for all practical purposes, involved a custody dispute between Daniel and Sabrina. I find this Court must respect Sabrina’s “superior” rights, as the natural mother, under the relevant law.
¶ 45. The present case is controlled by Waites. In that case, the husband learned he was not the child’s biological father three years after the couple’s marriage,[14] *753 and the natural mother and stepfather agreed to keep the child’s paternity a secret, holding the stepfather out as the natural parent even after they had divorced. It was not until two years after the divorce that the natural mother notified the biological father of the paternity results and demanded child-support payments, prompting the biological father’s demand for custody. The Waites court distinguished Pell and limiting them to their “unique facts,” and specifically mentioning the stepfather’s awareness that he was not the child’s biological father. The Waites court concluded that the stepfather’s rights were inferior to those of the natural parents, rejecting this Court’s finding that the stepfather stood on equal footing with the natural mother, and upheld the rule that “the grounds for rebutting the natural-parent presumption involve negative actions/dispositions of the natural parents in relation to the child (i.e., abandonment, desertion, immoral conduct detrimental to the child, unfitness).” Waites, 152 So.3d at 313 (¶ 17) (internal quotations omitted). As in the present case, the natural mother in Waites was never found to be unfit or to have abandoned the child, and her rights were found to be superior to those of the stepfather. Thus, the chancellor’s decision to award her physical custody was affirmed.
¶46. There is no question Daniel has been a caring and responsible stepfather to Justice, and has a strong emotional bond with both Justice and Alexice. However, the facts simply do not present “clear and convincing evidence” rebutting the natural-parent presumption in favor of the natural mother. Sabrina did not abandon or desert her children. The UCCJEA defines “abandoned” as being “left without provision for reasonable and necessary care and supervision.” Miss.Code. Ann. § 93-27-102(a). When Sabrina had to leave her apartment, she put the girls in Daniel’s temporary care while she attempted to procure appropriate living arrangements for a few weeks and to find a new job. She kept in contact with the girls during this period. There is no doubt Sabrina has had employment issues and has made some questionable decisions after her divorce from Daniel. But as of the date of the custody modification, she had a full-time job in Florida and was living in a nice home with her fiancé and two daughters. Since the move to Florida, Sabrina has provided the children with a nanny to get them to school and help them with homework while she works. The chancellor noted that Sabrina lives with her fian-cé, Darren, “without the benefit of marriage,” and Justice commented that the couple fights “constantly.” Justice also acknowledged that getting “kicked out” of the home temporarily had negatively affected her grades, stating.that she “was really stressed out about that.” However, neither child had an issue with Darren, stating that he was nice to them, and Justice said Darren. did not “influence [her] decision who [she] want[s] to live with whatsoever.” Sabrina has displayed some deceitful behavior toward Daniel, but the evidence in the record simply does not support a finding that Sabrina’s conduct “is so immoral as to be detrimental to the child” or that she is “unfit” to have custody. See Davis, 126 So.3d at 37 (¶ 10).
¶ 47. The chancellor stated at the hearing: “[T]he only way I could give [Daniel] custody would be to find [Sabrina] unfit and to give it to a third-party who is not the natural parent.” Yet he awarded custody of Justice to Daniel, a third party, without making any such findings, a fact that the majority acknowledges. : Our Court is bound to follow the well-settled law set forth by our supreme court: “[I]n the absence of rebutting the natural-parent presumption via clear and convincing *754 evidence of abandonment, desertion, immoral , conduct detrimental to the child, and/or unfitness, ‘the court may not consider granting custody to a third .party, including one standing in loco parentis.’ ” Waites, 152 So.3d at 314. (¶ 19) (quoting Davis, 126 So.3d at 37 (¶ 12)). I find the majority’s- holding unsupported by either the law or the facts. Since the record does not provide clear and convincing evidence to rebut the natural-parent presumption in this case, I would reverse and render the chancery court’s judgment awarding Daniel physical custody of Justice.
II. Modification of. Custody of Alex-ice
¶48. Addressing Sabrina’s remaining claim that there was no material change in circumstances that warranted the modification of custody, as it pertains to Alexice, I agree with the majority that there was sufficient evidencé to support a finding that a material change in circumstances adversely affecting Alexice had occurred. In awarding custody of both minor children to Daniel, the chancellor found there had “clearly ... been a material change in circumstances since the divorce- and the children ha[d] suffered as a result.” He said that the children testified they had been adversely affected by Sabrina’s lack of “stable living arrangements” and “erratic” employment. The chancellor- was “troubled by Sabrina’s total disregard of joint-legal custody” and her “sudden move” to Missouri without notice to Daniel. The chancellor also cited Sabrina’s lack of credibility in his order, reprimanding her for testimony that directly conflicted with the children’s testimony.
. ¶49. However, although I agree that sufficient evidence was presented to warrant a determination that a material change in circumstances adversely affecting Alexice has occurred, based on my determination that awarding custody of Justice to Daniel was in error, I find the judgment modifying custody, as it relates to Alexice, should be reversed and remanded for additional findings under Albright v. Albright, 437 So.2d 1003 (Miss.1983), taking into consideration the separation of the siblings and whether it would be in Alexice’s best interest to remain with Justice. “The separation of siblings is not a separate Albright factor, but one. factor ‘[that] the. chancellor may consider along with the best interest of the child.’ ” Moorman v. Moorman, 28 So.3d 670, 672 (¶ 7). (Miss.Ct.App.2009) (citation, omitted). Thus, the “separation of siblings, should not override a child’s best interest in a custody determination.” Owens v. Owens, 950 So.2d 202, 212 (¶ 35) (Miss.Ct.App.2006). In this instance, the chancellor specifically noted in his order that “the two minor children share a close sibling bond and it .is in the best interest of the children for them to live together.” Our caselaw generally has held “that the non-separation of a child from his or her siblings is usually in a child’s best interest.” Id. Daniel noted in his testimony that he “wanted the girls to be together” and. that is how he “ended up getting visitation with Justice was because both of us agreed that we wanted to keep the girls together.”
1Í 50. Since, in my view, the law does not permit Daniel to have custody of Justice,, I would remand to the chancery court for a determination of whether physical custody of Alexice should remain, with Daniel, or whether physical custody should be awarded to Sabrina, so that Alexice might remain with her older sister.
IRVING, P.J., AND JAMES, J., JOIN THIS OPINION.

. Although the majority indicates that the chancellor cited Pell and J.P.M. in his findings, the order clearly shows that the chancellor mentioned those cases as merely supplemental citations, and primarily relied on our ruling in V.D.W. in making his determination.

. In' J.P.M., the stepfather was listed on the child’s birth certificate and was considered the "legal father.” J.P.M., 932. So.2d at 770 (¶ 24). In Griffith, Robert Pell asked for' a paternity test during divorce proceedings and learned he was not the minor child’s natural father.

. Daniel claimed that he and Sabrina had discussed adoption, but said he did not “have any control of that,” stating it was up to Sabrina "to do it.” He also testified that when Sabrina changed Justice's last name to Westmoreland, he “thought [he] had adopted her.” When questioned again why he did not adopt the child, he stated that he “didn’t realize it was going to be such a kink.”
The majority contends Daniel “could have been” ordered to pay child support, but there is no indication that the chancellor ever considered ordering Daniel to pay any child support, medical expenses, or insurance for Justice. The original decree only recognized that both Daniel and Sabrina "acknowledge^] that Justice Westmoreland is not the biological or adopted child of [Daniel],” and visitation with Justice, along with Alexice, was ordered due to Justice’s "strong bond” with Daniel.

. In this respect, Waites is akin to Pell in that the husband was actually a “defrauded father.”