# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00302-COA

SABRINA LYNN WELTON                                    APPELLANT

v.

DANIEL WESTMORELAND                                    APPELLEE

DATE OF JUDGMENT:          02/12/2014
TRIAL JUDGE:               HON. ROBERT Q. WHITWELL
COURT FROM WHICH APPEALED: LAFAYETTE COUNTY CHANCERY
                           COURT
ATTORNEYS FOR APPELLANT:   A.E. (RUSTY) HARLOW JR.
                           KATHI CRESTMAN WILSON
ATTORNEYS FOR APPELLEE:    T. SWAYZE ALFORD
                           KAYLA FOWLER WARE
NATURE OF THE CASE:        CIVIL - CUSTODY
TRIAL COURT DISPOSITION:   MODIFIED CUSTODY, AWARDING
                           PHYSICAL CUSTODY OF BOTH MINOR
                           CHILDREN TO APPELLEE, AND
                           GRANTED VISITATIONS RIGHTS TO
                           APPELLANT
DISPOSITION:               AFFIRMED - 11/17/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

WILSON, J., FOR THE COURT:

¶1.     Daniel Westmoreland filed a complaint seeking modification of the physical custody of his daughter, Alexice Westmoreland, from his former wife, Sabrina Welton, to him. He later filed an amended complaint in which he also sought custody of Justice Westmoreland. Daniel is not Justice's biological father, but until she was twelve years old, she believed that he was. Justice's biological father abandoned her and has never made an attempt to see her

since her birth. Although Daniel knew that he was not Justice's biological father, he and Sabrina raised her together from the time she was four months old, and in 2004 Sabrina petitioned a court to change Justice's surname to Westmoreland. Justice learned that Daniel was not her biological father only when, in the lead-up to the instant litigation, Sabrina made a unilateral—and, the chancellor found, "very hurtful"—decision to tell her. After a hearing, the chancellor modified custody and awarded Daniel physical custody of both children.

¶2. We agree with the chancellor that he had jurisdiction over Justice under the Uniform Child Custody Jurisdiction and Enforcement Act. We also agree that under *Griffith v. Pell*, 881 So. 2d 184 (Miss. 2004), he had authority to grant physical custody of her to Daniel. Finally, we find no abuse of discretion in the chancellor's findings that there had been a material change in circumstances that adversely affected the children and that modification was in their best interests. Accordingly, we affirm the chancellor's ruling in all respects.

## FACTS AND PROCEDURAL HISTORY

¶3. Justice was born on July 10, 2000. Although Daniel was not her biological father, she was raised as his daughter from infancy. Daniel and Sabrina were not married at the time, but they lived together and led Justice to believe that Daniel was her father. In 2004, Sabrina petitioned a Missouri court to change Justice's surname to Westmoreland because, according to Sabrina's sworn petition, Justice's biological father had abandoned her and had made no attempt to see her since birth. Daniel and Sabrina were married in 2005, and on February 6, 2006, a daughter, Alexice, was born to them. The family later moved to Mississippi.

¶4. In August 2011, the Lafayette County Chancery Court entered a decree of divorce

2

terminating the marriage between Sabrina and Daniel. The decree incorporated the parties' property settlement, child custody, and support agreement. The decree granted the parties joint legal custody of Alexice and assigned physical custody of Alexice to Sabrina. Daniel was granted liberal visitation with Alexice, consisting of every weekend, six weeks in the summer, and holidays. In addition, the agreement "acknowledge[d] that Justice . . . is not the biological or adopted child of [Daniel], but that Justice . . . has developed a strong bond with [Daniel] and it is in [Justice's] best interest that [she] . . . have visitation with [Daniel] whenever he is exercising visitation with . . . Alexice."

¶5.    After the parties' divorce, Justice continued to believe that Daniel was her biological father. Daniel exercised visitation with both girls every weekend, and at Sabrina's request the girls also regularly spent weeknights at his house. Sabrina's employment was erratic. She was fired from a job in June 2012, and in July 2012 eviction proceedings were initiated against her for nonpayment of rent. As a result, in August 2012, Justice and Alexice went to live with Daniel on a full-time basis. Sabrina moved into a cabin in Water Valley that had limited bathroom facilities and was not suitable for children. From August to December 2012, the girls lived with Daniel, attended school in Lafayette County, and by all accounts were happy and doing well. A school teacher and a school counselor testified that Daniel brought the girls to school and attended their parent-teacher conferences, Justice's basketball games, and other school functions. These two witnesses rarely ever saw Sabrina.

¶6.    While Justice and Alexice were living with Daniel, Sabrina met a man on the internet (Darren) who at that time lived in the Cayman Islands. Sabrina and Darren met in person for

3

the first time in October 2012 and spent several nights together at hotels in Oxford and Memphis. In mid-December 2012, Daniel took Justice and Alexice to Missouri to spend the Christmas holiday with their grandmother (Sabrina's mother). While her daughters spent Christmas in Missouri with her family, Sabrina went to the Cayman Islands with Darren.

¶7. In December 2012, Sabrina not only vacationed in the Caymans but also quit her job in Water Valley. She did so even though she had no other employment prospects. Then, in January 2013 she abruptly moved to Missouri, taking the girls with her. She did not have a job lined up in Missouri either. Sabrina not only failed to tell Daniel that she was moving but also told him a bald-faced lie about where she was taking the girls. The day she left, she asked him to pack extra clothes for the girls because she wanted them to help her move back to Oxford, it was raining, and she was afraid they would get muddy. Daniel first learned that she was actually moving to Missouri, and taking the girls with her, when Justice called him from the road. Sabrina immediately took the phone from Justice, hung up, and refused to answer Daniel's calls. Daniel drove to Missouri that same day, but Sabrina refused to allow him unsupervised visitation. After moving to Missouri, Sabrina also made a unilateral—and, the chancellor found, "very hurtful"—decision to tell then-twelve-year-old Justice that Daniel was not her biological father.

¶8. In February 2013, Daniel filed a complaint for contempt and modification of custody. Sabrina filed a counterclaim for contempt, alleging that Daniel had not paid support or other expenses. In April 2013, the chancery court entered a temporary order that visitation should continue as outlined in the divorce decree, with instructions on when and where to transfer

4

the children.

¶9. In June 2013, only five months after she moved to Missouri, Sabrina decided to move again. This time she moved to South Florida to live with Darren, again taking the girls with her. They moved into a house that Darren owns, and Sabrina took a job as the manager of a Smoothie King. The children are cared for primarily by a full-time nanny. The nanny arrives early each weekday morning to wake the children, fix breakfast, take them to and pick them up from school, and help them with their homework. Justice and Alexice testified that Sabrina and Darren fight constantly.

¶10. In November 2013, Darren and Sabrina argued about Darren's demand that Sabrina sign a prenuptial agreement. As a result of this argument, Darren made Sabrina and her daughters move out of his house. They lived with a friend for about ten days until Darren allowed them to return. In her January 2014 testimony, Sabrina said that she and Darren had patched things up and had "the prenup ready to sign"—although it was not signed, and no wedding date was set. The chancellor appropriately expressed concerns about the "tenuous" and "unreliable" nature of Sabrina's living arrangements. Both Justice and Alexice testified that they miss their father and want to move back to Oxford to live with him.

¶11. In August 2013, Daniel amended his complaint to request physical custody of Justice as well as Alexice. Sabrina responded with a motion to dismiss, arguing that the court lacked jurisdiction over Justice. In December 2013, Daniel filed an amended complaint adding Justice's biological father as a defendant. The biological father was incarcerated in Missouri. He was served with process but never answered or appeared before the chancery court.

¶12. After a hearing, the chancellor entered a thorough opinion setting forth findings of fact and conclusions of law. He found that the court had jurisdiction over both children under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA); that on the "unique" facts of this case, Daniel "stands in the same place as a natural parent seeking custody" of Justice; that a material change in circumstances had occurred that adversely affected the children; and that it would be in the best interest of both children for Daniel to have physical custody and share joint legal custody with Sabrina. From this ruling, Sabrina appeals, arguing (1) that the chancery court lacked jurisdiction over Justice; (2) that the chancellor erred by not following the "natural parent presumption"; (3) and that the chancellor erred in finding a material change in circumstances and that modification was in the children's best interests. We find no error and therefore affirm.

## STANDARD OF REVIEW

¶13. "A chancellor's findings will not be disturbed on appeal 'when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.'" *Powell v. Powell*, 976 So. 2d 358, 361 (¶10) (Miss. Ct. App. 2008) (quoting *Sanderson v. Sanderson*, 824 So. 2d 623, 625-26 (¶8) (Miss. 2002)).

¶14. A chancery court's jurisdiction over a particular matter is a question of law subject to a de novo review. *Yeager v. Kittrell*, 35 So. 3d 1221, 1223 (¶12) (Miss. Ct. App. 2009) (citing *In re Guardianship of Z.J.*, 804 So. 2d 1009, 1011 (¶9) (Miss. 2002)). "However, the factual findings underpinning the jurisdiction question are reviewed under the familiar

6

substantial evidence and abuse of discretion standard." *Clifton v. Shannon*, 93 So. 3d 70, 72 (¶7) (Miss. Ct. App. 2012).

## ANALYSIS

### I.    The chancery court had jurisdiction over Justice.

¶15.    Sabrina claims that the chancery court did not have jurisdiction to award custody of Justice because Justice had not lived in Mississippi since January 2013, and there was no prior custody order concerning Justice entered in Mississippi. Sabrina further notes that an order was entered in Polk County, Missouri, in June 2013, requiring Justice's natural father, who was then incarcerated, to pay child support. The order directed him to pay $50 per month in child support, although there was no evidence that it was ever enforced or that any support was ever paid.

¶16.    In the order modifying custody, the chancellor found that jurisdiction existed because (1) Mississippi was the home state of both children when the matter was originally filed; (2) the chancery court had "continuing jurisdiction" because it granted a divorce that "included both of the minor children in its ruling"; and (3) no other court had jurisdiction over the custody of Justice.

¶17.    "The UCCJEA provides the exclusive jurisdictional basis for a state to make an initial child-custody determination." *Miller v. Mills*, 64 So. 3d 1023, 1025 (¶9) (Miss. Ct. App. 2011). This includes any "judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child." Miss. Code Ann. § 93-27-102(c) (Rev. 2013). Section 93-27-201(1)(a)-(b) (Rev. 2013) of the UCCJEA states that

7

a Mississippi court has jurisdiction to make an initial custody determination if:

> (a)  This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six (6) months before the commencement of the proceeding and the child is absent from the state but a parent or person acting as a parent continues to live in this state; [or]

> (b)  A court of another state does not have jurisdiction under paragraph (a) . . . and:

> > (i)  The child and the child's parents, or the child and at least one (1) parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

> > (ii)  Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships . . . .

"Home state" is defined in the UCCJEA as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." *Id.* § 93-27-102(g).  Once a Mississippi court "has made a child custody determination consistent with Section[] 93-27-201," that court "has exclusive, continuing jurisdiction over the determination[.]" *Id.* § 93-27-202(1) (Rev. 2013).

¶18.  We affirm the chancellor's ruling as to jurisdiction.  By its incorporation of the parties' settlement agreement, the divorce decree expressly provided for Daniel to have visitation with Justice and, as such, is within the plain language of the UCCJEA's definition of a "child custody determination." *Id.* § 93-27-102(c) ("a judgment, decree, or other order of a court providing for . . . visitation with respect to a child").  Thus, the decree vested the court with continuing jurisdiction over Justice. *Id.* § 93-27-202(1).

8

¶19. Alternatively, even assuming arguendo that the original decree did not confer continuing jurisdiction, Justice had been a resident of this State within six months prior to the filing of Daniel's original complaint for modification of custody and contempt, and Daniel's amended complaint seeking custody of Justice was based, at least in part, on the same conduct as the original complaint. *See* M.R.C.P. 15(c). Accordingly, the chancery court properly exercised jurisdiction pursuant to section 93-27-201(1)(a), *supra*.

¶20. Finally, even if we were to assume that Daniel's amended complaint did not relate back to date of the original complaint, jurisdiction would have existed under section 93-27-201(1)(b), *supra*, because, due to Sabrina's frequent moves, Justice did not have a "home state," as defined by the UCCJEA, when the amended complaint was filed.[1] Accordingly, we affirm the chancellor's determination that he had jurisdiction over the issue of Justice's custody on at least one of three alternative grounds.

## II. The chancellor had authority to grant Daniel physical custody of Justice.

¶21. In general, the "natural parent presumption" precludes a court from granting custody to a "third party" over the objection of a natural parent absent clear and convincing evidence that the natural parent has abandoned or deserted the child, has engaged in immoral conduct harmful to the child, or is an unfit parent. *See In re Waites*, 152 So. 3d 306, 314 (¶19) (Miss. 2014). The chancellor did not find that any of these grounds for overcoming the natural parent presumption had been established. Rather, citing *Griffith v. Pell*, 881 So. 2d 184

---

[1] "Jurisdiction is decided based on the existing facts at the time the action is commenced." *Joshua Props. LLC v. D1 Sports Holdings LLC*, 130 So. 3d 1089, 1092 (¶8) (Miss. 2014).

(Miss. 2004) ("*Pell*"), and *J.P.M. v. T.D.M.*, 932 So. 2d 760 (Miss. 2006), the chancellor concluded that on the "unique" facts of this case Daniel "*stands in the place of a natural parent*" for purposes of custody of Justice.[2] For the reasons that follow, we agree with the chancellor's legal conclusion.

¶22. In *Pell*, the Supreme Court held that a husband who learned during divorce proceedings that he was not the biological father of a child born just prior to the marriage could be granted visitation and custody over the objections of his wife (the child's mother). *See Pell*, 881 So. 2d at 185-87 (¶¶1-11). In a similar scenario in *J.P.M.*, the Supreme Court affirmed an order granting custody to a husband who had learned during divorce proceedings that he was not the biological father of a child born during the marriage. He was deemed the "father in fact" and was not required to present additional evidence to rebut the natural parent presumption. *See J.P.M.*, 932 So. 2d at 762-70 (¶¶1-26). However, in *Smith v. Smith*, 97 So. 3d 43 (Miss. 2012), and *Waites*, *supra*, the Court explained that "*Pell* and *J.P.M.* are limited to their unique facts":

> [I]n loco parentis can—in very limited, unique situations—sometimes be used to help rebut the natural-parent presumption. In both *Pell* and *J.P.M.*, a husband learned during the pendency of divorce proceedings that he was not the biological father of a child born of, or just prior to, the marriage. In those cases, we reasoned that the natural-parent presumption had been overcome based on several facts: (1) the husbands stood in loco parentis; (2) they had supported, cared for, and treated the child as their own; (3) they could have been required to pay child support ("with the burden should go the benefit"); and (4) the biological fathers were not really in the picture: the one in *Pell* had disclaimed any interest in the child and had agreed to relinquish his parental

_____

[2] (Emphasis added). The chancellor also cited our opinion in *In re V.D.W.*, 152 So. 3d 336 (Miss. Ct. App. 2013), which the Supreme Court reversed in *Waites*, *supra*. Our analysis relies on the Supreme Court's opinions in *Pell*, *J.P.M.*, and *Waites*.

rights, while the one in *J.P.M.* could not even be determined conclusively.

*Waites*, 152 So. 3d at 312 (¶¶15-16) (quoting *Smith*, 97 So. 3d at 47 (¶11) & n.4).

¶23.    Each of these "several facts" is present in this case. First, there can be no dispute that Daniel "stood in loco parentis." "The Mississippi Supreme Court . . . has 'defined a person acting in loco parentis as one who has assumed the status and obligations of a parent without a formal adoption.'" *Smiley v. Smiley*, 165 So. 3d 481, 487-88 (¶26) (Miss. Ct. App. 2015) (quoting *Worley v. Jackson*, 595 So. 2d 853, 855 (Miss. 1992)). Daniel had helped to raise Justice since she was four months old. Sabrina had Justice's last name changed to "Westmoreland" in 2004 precisely because Justice's biological father had abandoned her. Justice herself believed Daniel to be her biological father until she was told by Sabrina, after moving to Missouri in 2013, that he was not. Justice told the chancellor that she loved Daniel and referred to him as "Dad."

¶24.    Second, the evidence shows, and the chancellor found, that Daniel supported, cared for, and treated Justice as his own daughter. *Waites*, 152 So. 3d at 312 (¶15). This fact is demonstrated by the same evidence that shows that Daniel stands in loco parentis. Also, as in *J.P.M.*, Daniel assumed primary responsibility for Justice's care, at Sabrina's request, after Sabrina was evicted from her apartment and unable to care for her in 2012. *See J.P.M.*, 932 So. 2d at 762 (¶1).

¶25.    Third, although the parties' divorce decree did not order Daniel to pay child support for Justice,[3] *Waites* and *Smith* state that the relevant question is whether Daniel "*could have*

_____

[3] The decree did order Daniel to pay support for Alexice. Sabrina argues that Daniel should be estopped from seeking custody of Justice because the decree did not order him to

11

*been* required to pay child support" for Justice. *Waites*, 152 So. 3d at 312 (¶15) (emphasis added) (quoting *Smith*, 97 So. 3d at 47 (¶11)). Supreme Court precedent indicates that such an order "could have been" entered:

> Where a stepfather, as an incident to a new marriage, has agreed to support the children of a previous marriage, or where he does so over a period of time and the mother and the children in good faith rely to their detriment on that support, the best interests of the children require entry of a child support decree against the stepfather.

*Logan v. Logan*, 730 So. 2d 1124, 1126 (¶9) (Miss. 1998). Here, Daniel provided support for Justice from the time she was a baby until the parties' divorce, when Justice was eleven years old. Moreover, with Sabrina's support, Daniel led Justice to believe that she was his daughter. This too could have supported an order to pay child support. *See* Deborah H. Bell, *Mississippi Family Law* § 10.03[3], at 294 (2005) (discussing cases in which "courts have ordered support from divorced stepparents based on the doctrine of equitable estoppel," including *Ross v. Ross*, 314 A.2d 623, 626 (N.J. Juv. Ct. 1973), *aff'd*, 342 A.2d 566 (N.J. Super. Ct. App. Div. 1975), in which "support was ordered for a child who believed [his] stepfather's representations that he was the child's father").

¶26. Fourth, as in *Pell* and *J.P.M.*, Justice's "biological father[] [is] not really in the

---

pay child support for her and because he did not litigate the issue of Justice's custody at the time of the divorce. However, the parties reached a negotiated settlement that granted Daniel liberal visitation with both girls—*every* weekend, six weeks in the summer, and holidays. "The law favors settlement of disputes by agreement of the parties," "[a]nd this is as true of agreements made in the process of the termination of the marriage by divorce as in any other kind of negotiated settlement." *McManus v. Howard*, 569 So. 2d 1213, 1215 (Miss. 1990). Given that the parties' negotiated settlement provided Daniel with extensive visitation, his decision not to litigate was entirely reasonable and should not give rise to an estoppel.

picture." *Waites*, 152 So. 3d at 312 (¶15) (quoting *Smith*, 97 So. 3d at 47 (¶11)). Again, Sabrina herself petitioned to change Justice's surname to Westmoreland because Justice's biological father had "abandoned" her and had made no "attempt to see [her] since her birth." The biological father was incarcerated in Missouri during this case. He was named as a defendant and served with Daniel's amended complaint but did not answer or appear. In June 2013, a Missouri court did enter an order requiring him to pay $50 per month in child support; however, other documents in the record suggest that he was unlikely to make even these meager payments due to his incarceration and lack of income. There is no evidence in the record to suggest that he is "in the picture."

¶27.    Thus, each of the "several facts" that the Supreme Court enumerated in *Waites* and *Smith* as having been significant to its decisions in *Pell* and *J.P.M.* is also present in this case. The remaining question is whether those facts are sufficient to place Daniel in the position of a natural parent for purposes of Justice's custody—or, instead, the Supreme Court has strictly limited the holdings of *Pell* and *J.P.M.* to cases in which the husband actually (mistakenly) believed that he was the child's biological father. *See Waites*, 152 So. 3d at 312 (¶¶15-16) (quoting *Smith*, 97 So. 3d at 47 (¶11) & n.4). None of the relevant Supreme Court decisions directly address this specific issue. However, in the most recent of these decisions, the Court placed special emphasis on the status of the child's biological father—whether he was actively seeking custody and asserting his parental rights or was "not really in the picture." *See Waites*, 152 So. 3d at 313-14 (¶18). The Court's recent emphasis on this issue echoes its reasoning in *Pell*:

> A California Court of Appeal has stated that "whatever role genetic testing may play in resolving disputes between competing would-be fathers, we fail to see what purpose is served by using genetic testing to defeat an existing father-child relationship when there is no biological father seeking to assume care, support and nurturance of the child." We agree wholeheartedly.

*Pell*, 881 So. 2d at 187 (¶10) (quoting *In re Raphael P.*, 118 Cal. Rptr. 2d 610, 625 (Ct. App. 2002)).

¶28. Thus, although the relevant Supreme Court decisions do not directly address the unique facts of this case, *Pell*'s reasoning and *Waites*'s emphasis on whether the biological father is "really in the picture" are instructive and should control. As applied to this case, the mere existence of a biological father who abandoned a child years ago should not be used "to defeat an existing father-child relationship when [that] biological father [is not] seeking to assume care, support and nurturance of the child." *Pell*, 881 So. 2d at 187 (¶10) (quoting *In re Raphael P.*, 118 Cal. Rptr. 2d at 625). Moreover, Sabrina led Justice to believe that Daniel was her father for twelve years and confirmed in sworn pleadings that Justice's biological father had abandoned her at birth. Having done so, Sabrina cannot now use the mere fact that this absentee biological father exists, somewhere, to defeat Daniel's claim to custody and Justice's desire to live with the person she has always considered her father.

¶29. The dissent[4] asserts that our supposed "constant emphasis on the fact that Justice's biological father is absent" is a "red herring." But this is not a novel point. The Supreme

---

[4] The separate opinion concurs with this opinion as to the equitable division of the marital property only. Because our references to the separate opinion address its dissenting views, we refer to it as the dissent.

Court's opinions in *Pell*, *J.P.M.*, and *Waites* all emphasize this same fact.[5]   The dissent argues that the point is a "red herring" because Justice's biological father is not seeking custody and so, "for all practical purposes," this is "a custody dispute between Daniel and Sabrina."  But the same was true in *Pell* and *J.P.M.*—in each of those cases, just as in this one, the biological father was not in the picture, and so the custody dispute was between the child's biological mother and her nonbiological father.

¶30.    There is no smelly fish or false trail here.[6]  Our point of disagreement with the dissent is straightforward and should be clear:  We disagree that *Pell* and *J.P.M.* have been so narrowly limited as to apply *only* in "defrauded father" cases.  Neither of those opinions, nor any subsequent decision, holds that.  Nor does the dissent provide any sound reason for its rule that a child's custody depends on whether the child's father was defrauded years earlier, rather than on any consideration remotely related to the child's well-being or best interest.[7]

---

[5] *See, e.g.*, *Pell*, 881 So. 2d at 187 (¶¶9-10) (concluding "wholeheartedly" that "an existing [nonbiological] father-child relationship" should not be defeated "*when there is no biological father seeking to assume care, support and nurturance of the child*" (emphasis added) (quoting *In re Raphael P.*, 118 Cal. Rptr. 2d at 625)); *J.P.M.*, 932 So. 2d at 770 (¶25) (emphasizing that "no man is seeking to fill Tom's role as Catherine's father"); *Waites*, 152 So. 3d at 313 (¶18) ("Unlike [*Pell* and *J.P.M.*], in which the biological fathers were not really in the picture, here . . . [the biological father] instituted custody proceedings." (quotation marks omitted)).

[6] The red herring has been described as "the most oft-cited fish in American jurisprudence." *In re Initial Pub. Offering Secs. Litig.*, 220 F.R.D. 30, 35 n.29 (S.D.N.Y. 2003).  On the origins of the expression, which generally means something intended to distract the reader's attention from the real issues, see Michael Quinion, *The Lure of the Red Herring*, World Wide Words, http://www.worldwidewords.org/articles/herring.htm (last visited Nov. 17, 2015).

[7] The dissent accepts, or at least does not dispute, the chancellor's determination that Sabrina's post-divorce decisions and conduct have adversely affected the girls and that

15

We certainly do agree with the dissent that we are "bound to follow" Supreme Court precedent. And while the relevant precedents do not directly address the specific issue this case raises, we believe that is exactly what we have done.

¶31. In summary, we agree with the chancellor that *Pell* and subsequent Supreme Court decisions provided legal authority to grant physical custody of Justice to Daniel.

> **III. Substantial evidence supports the chancellor's findings that a material change in circumstances had occurred, that the change adversely affected the children, and that modification was in the best interests of the children.**

¶32. We now address Sabrina's remaining claim that there was no material change in circumstances that warranted the modification of custody. "A modification of custody requires the noncustodial parent to prove: (1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." *Powell*, 976 So. 2d at 361 (¶11) (citing *Giannaris v. Giannaris*, 960 So. 2d 462, 467-68 (¶10) (Miss. 2007)). The chancery court "must consider the totality of the circumstances" in its determination whether a material change in circumstances has occurred. *Id.* (citing *Creel v. Cornacchione*, 831 So. 2d 1179, 1183 (¶15) (Miss. Ct. App. 2002)). "The concept" of a material change in circumstances is not limited by "semantic qualifiers" and "is intended to encompass its broadest possible meaning in order to protect children." *Marter v. Marter*, 914

---

allowing them to live with Daniel would be in their best interests. Nonetheless, the dissent would leave Justice in Sabrina's custody and remand for the chancellor to decide which is more important to Alexice's best interest: being in Daniel's custody or continuing to live with her older sister. We do not believe that the law imposes that unenviable choice on the chancellor.

16

So. 2d 743, 748-49 (¶14) (Miss. Ct. App. 2005). Therefore, a change in circumstances "that poses a clear danger to the child's mental or emotional health can justify a custody change." *Cantin v. Cantin*, 78 So. 3d 943, 948 (¶20) (Miss. Ct. App. 2012) (quoting *Gainey v. Edington*, 24 So. 3d 333, 336 (¶10) (Miss. Ct. App. 2009)).

¶33. The chancellor found that "[c]learly there has been a material change in circumstances since the divorce and the children have suffered as a result." In support, the chancellor primarily cited Sabrina's repeated failure "to provide any stable living arrangements for the minor children." After multiple moves, she ended up living in a home in which she had no legal right to stay, and then she "and the two minor children were kicked out of [the] house" as the result of a dispute over a prenuptial agreement. This occurred only two months prior to the hearing in the chancery court.[8]

¶34. It is true that "the mere moving of the custodial parent does not constitute a material change in circumstances for child custody modification purposes." *Giannaris*, 960 So. 2d at 468 (¶11).[9] Nor is the distance moved "dispositive as to whether a material change in circumstances has occurred; it is the effect the move has on the child and the custody

---

[8] While not directly disputing the chancellor's finding of a material change in circumstances, the dissent attempts to describe Sabrina's circumstances in more positive terms, emphasizing that "*as of the date of the custody modification*, she . . . was living in a nice home with her fiancé and two daughters." While this is a true statement, we conclude that the chancellor was within his discretion in giving greater weight to the fact that only two months prior to the hearing, Sabrina's fiancé forced her and her daughters to leave *his* nice home, and that there was no assurance that he would not do so again in the future if he and Sabrina had another argument.

[9] "Mississippi is in a minority of states in which a custodial parent's move is not, in itself, a material change in circumstances." Bell, § 5.11[5][b], at 142.

17

arrangement that is dispositive." *Pearson v. Pearson*, 11 So. 3d 178, 182 (¶10) (Miss. Ct. App. 2009).

¶35. However, the chancellor considered more than just Sabrina's relocation in his ruling. Sabrina's "erratic" employment resulted in the children's being uprooted several times in the span of eighteen months. The chancellor also expressed the very reasonable concern that another argument with Darren could leave the girls homeless. Darren had "kicked [them all] out" of his house only two months prior to the hearing, and Sabrina and the girls had no right to remain in the home if Darren once again decided he wanted them out. Justice testified that the instability and uncertainty caused by the frequent moves and tenuous living arrangements, as well as the constant arguing between Darren and Sabrina, were stressful. Alexice likewise testified that the constant fighting frightened her. Particularly given that we afford the chancellor "considerable discretion" in his findings, we conclude that there was sufficient evidence to support a finding of a material change in circumstances that adversely affected the children. *Jones v. Jones*, 101 So. 3d 731, 733 (¶7) (Miss. Ct. App. 2012) ("In domestic-relations matters, chancellors enjoy considerable discretion and are trusted to evaluate the specific facts of each case.").

¶36. We also find that the chancellor committed no abuse of discretion in his application of the *Albright*[10] factors and determination that modifying custody to grant physical custody to Daniel would be in the children's best interests. Sabrina asserts that the chancellor erred

---

[10] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). The chancellor must apply the *Albright* factors when considering whether a material change in circumstances warrants a modification of child custody. *Sturgis v. Sturgis*, 792 So. 2d 1020, 1025 (¶19) (Miss. Ct. App. 2001).

in finding modification to be in the children's best interests, but she offers no support for the argument and fails to discuss any of the *Albright* factors. Her argument instead focuses on the threshold issue of a material change in circumstances. Therefore, any claim of error in the chancellor's *Albright* analysis is procedurally barred. *Funderburg v. Pontotoc Elec. Power Ass'n*, 6 So. 3d 439, 442 (¶9) (Miss. Ct. App. 2009); M.R.A.P. 28(a)(6). Procedural bar notwithstanding, the chancellor carefully considered each of the *Albright* factors, and so we also find no abuse of discretion in his determination that modification would be in the children's best interests.

## CONCLUSION

¶37. The chancellor correctly held that he had jurisdiction and authority to modify custody and grant Daniel physical custody of both Justice and Alexice. In addition, he committed no abuse of discretion in finding that a material change of circumstances had occurred, that the change adversely affected the children, and that a modification of custody would be in their best interests. Accordingly, we affirm the chancellor's ruling in all respects.

¶38. **THE JUDGMENT OF THE CHANCERY COURT OF LAFAYETTE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND JAMES, J.**

**BARNES, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶39. I concur with the majority's finding that the chancellor had jurisdiction. However, I cannot accept the majority's characterization of Daniel's position as comparable to the

19

"unique" factual situations in *Griffith v. Pell*, 881 So. 2d 184 (Miss. 2004), and *J.P.M. v. T.D.M.*, 932 So. 2d 760 (Miss. 2006). Accordingly, I dissent.

## I.  The Chancery Court's Lack of Authority to Grant Daniel Physical Custody of Justice

¶40.  As noted by the majority, there is no dispute that Daniel was acting in loco parentis. While the doctrine of in loco parentis "grants third parties certain parental rights," our supreme court has emphasized that "such rights are inferior to those of a natural parent." *Davis v. Vaughn*, 126 So. 3d 33, 37 (¶12) (Miss. 2013); *see also In re Adoption of Wright*, 160 So. 3d 737, 741 (¶11) (Miss. Ct. App. 2015) ("Our law clearly has a strong presumption that a natural parent's right to custody is superior to that of third parties, whether grandparents or others." (quoting *Grant v. Martin*, 757 So. 2d 264, 266 (¶9) (Miss. 2000))). "[I]t is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party." *Davis,* 126 So. 3d at 37 (¶10) (citation omitted). This presumption "may be rebutted by clear and convincing evidence that '(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.'" *Id*. (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶9) (Miss. 2012)).

> In a custody case involving a natural parent and a third party, the court must first determine whether through abandonment, desertion, or other acts demonstrating unfitness to raise a child, as shown by clear and convincing evidence, the natural parent has relinquished his right to claim the benefit of the natural-parent presumption. If the court finds one of these factors has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the *Albright* factors.

20

*In re Dissolution of Marriage of Leverock & Hamby,* 23 So. 3d 424, 431 (¶24) (Miss. 2009).

Thus, "in a custody dispute between one standing in loco parentis and a natural parent, the parent is entitled to custody *unless the natural-parent presumption is rebutted.*" *Davis*, 126 So. 3d at 37 (¶10) (emphasis added) (citing *Smith*, 97 So. 3d at 46-47)).

¶41.    To support his ruling, the chancellor primarily relied on *In re V.D.W.*, 152 So. 3d 336, 441-42 (¶¶28-30) (Miss. Ct. App. 2013), a case in which this Court reversed the chancery court's award of custody to the natural mother and held that, because the stepfather had taken care of the child and treated her as his own, and "share[d] equal custody time and expenses" with the natural mother, he "had overcome the natural-parent presumption." However, when the chancellor made his custody determination in this case, *V.D.W.* was pending before the supreme court on a petition for certiorari. On June 12, 2014, the petition was granted, and the supreme court subsequently overturned our holding, finding that this Court's position – that the stepfather's "positive, supportive, fatherly actions operated to rebut the natural-parent presumption and placed [the father *acting in loco parentis*] on equal footing with [the mother] and [biological father] for purposes of an *Albright* analysis" – was not "congruent with the present state of the law." *In re Waites*, 152 So. 3d 306, 313 (¶17) (Miss. 2014). The supreme court held that the chancellor's ruling – that the natural mother should have full legal and physical custody and that the stepfather failed to prove the natural parents were "unfit" – was "correct, given the controlling law[.]" *Id*. at 309, 314 (¶¶8, 20). The court stated that, "[u]nder the present state of the law, in the absence of rebutting the natural-parent presumption via clear and convincing evidence of abandonment, desertion, immoral conduct

21

detrimental to the child, and/or unfitness, 'the court may not consider granting custody to a third party, including one standing in loco parentis.'" *Id*. at 314 (¶19) (quoting *Davis,* 126 So. 3d at 37 (¶12)). Thus,"a third party's in loco parentis status, standing alone, [cannot] rebut the natural-parent presumption." *Id.* at 311 (¶14) (citing *Davis*, 126 So. 3d at 37 (¶12)).

¶42. However, citing *Pell*, 881 So. 2d 184, and *J.P.M.*, 932 So. 2d 760, the majority finds that the "unique facts" of this case are sufficient to rebut the natural-parent presumption, referencing the *child's* belief that Daniel was her father and emphasizing the biological father's absence.[11] I find those cases are clearly distinguishable from the present circumstances. *Pell* and *J.P.M.* involved fathers who believed they were the biological fathers of the children at issue and had raised the child under that assumption.[12] As noted Dean Bell's treatise, *Bell on Mississippi Family Law*, "[t]he [supreme] court [has] distinguished the 'defrauded father' cases in which a husband was granted custody of a child whom he believed to be his. In those cases, the father's in loco parentis status was only one of the factors considered." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.06(2) at 77 (Supp. 2013) (citing *Smith*, 97 So. 3d at 48 (¶11). These are not the facts before us in this case. This is not a "defrauded father" case; Daniel knew Justice was not his daughter before

[11] Although the majority indicates that the chancellor cited *Pell* and *J.P.M.* in his findings, the order clearly shows that the chancellor mentioned those cases as merely supplemental citations, and primarily relied on our ruling in *V.D.W.* in making his determination.

[12] In *J.P.M.*, the stepfather was listed on the child's birth certificate and was considered the "legal father." *J.P.M.*, 932 So. 2d at 770 (¶24). In *Griffith*, Robert Pell asked for a paternity test during divorce proceedings and learned he was not the minor child's natural father.

his marriage to Sabrina, and he admitted that he never attempted to adopt Justice.[13]

¶43.    Furthermore, in *Pell*, the supreme court merely established that the stepfather "may be required to pay child support" and "may be awarded custody and/or visitation rights," and there was no discussion of the natural-parent presumption. *Pell*, 881 So. 2d at 186 (¶8). In a special concurrence to *J.P.M.*, Justice Cobb remarked:

> [A] person standing in loco parentis has the rights of a parent as against the entire world, *except the natural parents*. In *Pell*, that standard was changed, without analysis, to apply against the child's natural mother and in favor of what is in reality a third party. The change in *Pell* tore in loco parentis from its original moorings. In loco parentis was never meant to be used against the natural parent as it is in this case and in Pell. Rather, the doctrine was intended to protect third parties, who assume custody and care of a child whose natural parents are absent or unable to care for it, from losing the child to other third parties including the State. . . . This Court has twisted the meaning of in loco parentis and is now using it in a way that is clearly unwarranted by our precedent.

*J.P.M.*, 932 So. 2d at 781 (¶¶73, 75) (Cobb, P.J., specially concurring). In *J.P.M.*, the supreme court did uphold the chancellor's finding that the stepfather should have physical custody of the minor child. However, in that case, the stepfather was considered to be the child's legal father on her birth certificate, *id*. at 766 (¶16) (majority opinion), and the

_____

[13] Daniel claimed that he and Sabrina had discussed adoption, but said he did not "have any control of that," stating it was up to Sabrina "to do it." He also testified that when Sabrina changed Justice's last name to Westmoreland, he "thought [he] had adopted her." When questioned again why he did not adopt the child, he stated that he "didn't realize it was going to be such a kink."

The majority contends Daniel "could have been" ordered to pay child support, but there is no indication that the chancellor ever considered ordering Daniel to pay any child support, medical expenses, or insurance for Justice. The original decree only recognized that both Daniel and Sabrina "acknowledge[d] that Justice Westmoreland is not the biological or adopted child of [Daniel]," and visitation with Justice, along with Alexice, was ordered due to Justice's "strong bond" with Daniel.

23

chancery court had expressed concern that the natural mother, who had a history of drug use, might relapse. *Id*. at 765 (¶10). There was no putative father seeking custody; in fact, the child's "biological father ha[d] not been conclusively established[.]" *Id.* at 770 (¶25). Therefore, the circumstances fell within those addressed by Justice Cobb in her special concurrence – the third party, acting in loco parentis, was given custody, as neither natural parent was determined to be willing or able to care properly for the child.

¶44. Again, those are not the facts before us. I find the majority's constant emphasis on the fact that Justice's biological father is absent to be a "red herring." While the natural father was brought in as a party in the proceedings below, he never made an appearance, and this case has, for all practical purposes, involved a custody dispute between Daniel and Sabrina. I find this Court must respect Sabrina's "superior" rights, as the natural mother, under the relevant law.

¶45. The present case is controlled by *Waites*. In that case, the husband learned he was not the child's biological father three years after the couple's marriage,[14] and the natural mother and stepfather agreed to keep the child's paternity a secret, holding the stepfather out as the natural parent even after they had divorced. It was not until two years after the divorce that the natural mother notified the biological father of the paternity results and demanded child-support payments, prompting the biological father's demand for custody. The *Waites* court distinguished *Pell* and *J.P.M.*, limiting them to their "unique facts," and specifically mentioning the stepfather's awareness that he was not the child's biological father. The

---

[14] In this respect, *Waites* is akin to *Pell* in that the husband was actually a "defrauded father."

24

*Waites* court concluded that the stepfather's rights were inferior to those of the natural parents, rejecting this Court's finding that the stepfather stood on equal footing with the natural mother, and upheld the rule that "the grounds for rebutting the natural-parent presumption involve negative actions/dispositions of the natural parents in relation to the child (i.e., abandonment, desertion, immoral conduct detrimental to the child, unfitness)." *Waites*, 152 So. 3d at 313 (¶17) (internal quotations omitted). As in the present case, the natural mother in *Waites* was never found to be unfit or to have abandoned the child, and her rights were found to be superior to those of the stepfather. Thus, the chancellor's decision to award her physical custody was affirmed.

¶46.    There is no question Daniel has been a caring and responsible stepfather to Justice, and has a strong emotional bond with both Justice and Alexice. However, the facts simply do not present "clear and convincing evidence" rebutting the natural-parent presumption in favor of the natural mother. Sabrina did not abandon or desert her children. The UCCJEA defines "abandoned" as being "left without provision for reasonable and necessary care and supervision." Miss. Code. Ann. § 93-27-102(a). When Sabrina had to leave her apartment, she put the girls in Daniel's temporary care while she attempted to procure appropriate living arrangements for a few weeks and to find a new job. She kept in contact with the girls during this period. There is no doubt Sabrina has had employment issues and has made some questionable decisions after her divorce from Daniel. But as of the date of the custody modification, she had a full-time job in Florida and was living in a nice home with her fiancé and two daughters. Since the move to Florida, Sabrina has provided the children with a

25

nanny to get them to school and help them with homework while she works. The chancellor noted that Sabrina lives with her fiancé, Darren, "without the benefit of marriage," and Justice commented that the couple fights "constantly." Justice also acknowledged that getting "kicked out" of the home temporarily had negatively affected her grades, stating that she "was really stressed out about that." However, neither child had an issue with Darren, stating that he was nice to them, and Justice said Darren did not "influence [her] decision who [she] want[s] to live with whatsoever." Sabrina has displayed some deceitful behavior toward Daniel, but the evidence in the record simply does not support a finding that Sabrina's conduct "is so immoral as to be detrimental to the child" or that she is "unfit" to have custody. *See Davis*, 126 So. 3d at 37 (¶10).

¶47. The chancellor stated at the hearing: "[T]he only way I could give [Daniel] custody would be to find [Sabrina] unfit and to give it to a third-party who is not the natural parent." Yet he awarded custody of Justice to Daniel, a third party, without making any such findings, a fact that the majority acknowledges. Our Court is bound to follow the well-settled law set forth by our supreme court: "[I]n the absence of rebutting the natural-parent presumption via clear and convincing evidence of abandonment, desertion, immoral conduct detrimental to the child, and/or unfitness, 'the court may not consider granting custody to a third party, including one standing in loco parentis.'" *Waites*, 152 So. 3d at 314 (¶19) (quoting *Davis,* 126 So. 3d at 37 (¶12)). I find the majority's holding unsupported by either the law or the facts. Since the record does not provide clear and convincing evidence to rebut the natural-parent presumption in this case, I would reverse and render the chancery court's judgment

awarding Daniel physical custody of Justice.

## II. Modification of Custody of Alexice

¶48. Addressing Sabrina's remaining claim that there was no material change in circumstances that warranted the modification of custody, as it pertains to Alexice, I agree with the majority that there was sufficient evidence to support a finding that a material change in circumstances adversely affecting Alexice had occurred. In awarding custody of both minor children to Daniel, the chancellor found there had "clearly . . . been a material change in circumstances since the divorce and the children ha[d] suffered as a result." He said that the children testified they had been adversely affected by Sabrina's lack of "stable living arrangements" and "erratic" employment. The chancellor was "troubled by Sabrina's total disregard of joint-legal custody" and her "sudden move" to Missouri without notice to Daniel. The chancellor also cited Sabrina's lack of credibility in his order, reprimanding her for testimony that directly conflicted with the children's testimony.

¶49. However, although I agree that sufficient evidence was presented to warrant a determination that a material change in circumstances adversely affecting Alexice has occurred, based on my determination that awarding custody of Justice to Daniel was in error, I find the judgment modifying custody, as it relates to Alexice, should be reversed and remanded for additional findings under *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983), taking into consideration the separation of the siblings and whether it would be in Alexice's best interest to remain with Justice. "The separation of siblings is not a separate *Albright* factor, but one factor '[that] the chancellor may consider along with the best interest of the

27

child.'" *Moorman v. Moorman*, 28 So. 3d 670, 672 (¶7) (Miss. Ct. App. 2009) (citation omitted). Thus, the "separation of siblings should not override a child's best interest in a custody determination." *Owens v. Owens*, 950 So. 2d 202, 212 (¶35) (Miss. Ct. App. 2006). In this instance, the chancellor specifically noted in his order that "the two minor children share a close sibling bond and it is in the best interest of the children for them to live together." Our caselaw generally has held "that the non-separation of a child from his or her siblings is usually in a child's best interest." *Id*. Daniel noted in his testimony that he "wanted the girls to be together" and that is how he "ended up getting visitation with Justice was because both of us agreed that we wanted to keep the girls together."

¶50. Since, in my view, the law does not permit Daniel to have custody of Justice, I would remand to the chancery court for a determination of whether physical custody of Alexice should remain with Daniel, or whether physical custody should be awarded to Sabrina, so that Alexice might remain with her older sister.

**IRVING, P.J., AND JAMES, J., JOIN THIS OPINION.**