# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00090-COA

JESSICA HORN                                              APPELLANT

v.

RICKEY SEEDEN                                              APPELLEE

DATE OF JUDGMENT:            12/16/2022
TRIAL JUDGE:                 HON. MARGARET ALFONSO
COURT FROM WHICH APPEALED:   HARRISON COUNTY CHANCERY COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      JEANINE M. CARAFELLO
ATTORNEY FOR APPELLEE:       SUSAN WELDON CULPEPPER
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 04/09/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. The Harrison County Chancery Court entered a judgment granting Jessica Horn and

Rickey Seeden joint legal and physical custody of their five-year-old minor child, J.S.[1] After

DNA tests ordered during the custody proceedings revealed that Rickey is not J.S.'s

biological father, the chancellor found that Rickey stood *in loco parentis* and therefore could

be granted custody of J.S.

¶2. Jessica now appeals. After our review, we find no error, and we affirm the

chancellor's judgment.

## FACTS

---

[1] We use initials for the minor child in this case to protect his identity.

¶3. In July 2017, Jessica gave birth to J.S. Jessica and Rickey were in a romantic relationship, and both parties assumed Rickey was J.S.'s biological father. J.S.'s birth certificate listed Rickey as the natural father.

¶4. Jessica and Rickey separated in 2020. After their separation, the parties verbally agreed to alternate weeks of custody of J.S. This arrangement continued until August 2022, when J.S. started kindergarten. At Jessica's request, the parties modified their custody arrangement to allow Jessica to have physical custody of J.S. during the school week, with Rickey having custody of J.S. on the weekends.

¶5. Testimony from the proceedings revealed that in September 2022, the parties had a disagreement about the custody schedule. In October 2022, Jessica filed a complaint for emergency temporary custody of J.S. In her complaint, Jessica alleged that Rickey used drugs in his home while J.S. was present and that Rickey also sold drugs from his home. Jessica asserted that Rickey's conduct put J.S. in danger. The chancellor entered an emergency ex parte order awarding Jessica temporary physical custody of J.S. and setting the matter for a hearing.

¶6. At the hearing on the ex parte order, Rickey was represented by counsel, and Jessica appeared pro se. After Jessica indicated her desire for DNA testing to establish J.S.'s paternity, the chancellor entered an order directing Rickey to obtain a DNA test. Based on Jessica's assertions in the emergency petition, the chancellor also ordered the parties to undergo drug testing. Rickey and Jessica agreed, at the chancellor's suggestion, to rescheduling the hearing after the DNA testing and drug screening, and the court entered an

order resetting the matter for November 2, 2022.

¶7. Results from the DNA test established that Rickey was not the biological father of J.S. At the November 2, 2022 hearing, Rickey informed the chancellor that although he was not J.S.'s biological father, he intended to pursue custody of J.S. under the doctrine of *in loco parentis*. Because Jessica failed to appear at the hearing and present evidence in support of her request for emergency temporary custody, the chancellor entered an order dissolving the emergency ex parte custody order.

¶8. On November 8, 2022, Rickey filed a petition seeking custody and visitation of J.S. In his petition, Rickey acknowledged that paternity testing established that he was not the biological father of J.S. However, Rickey claimed that he stood *in loco parentis* and was therefore entitled to custody of J.S.

¶9. The following day, Jessica filed another petition for emergency temporary custody of J.S. In her complaint, Jessica asserted that Rickey was not J.S.'s father and that she "d[id] not want drugs around" J.S. On November 10, 2022, the chancellor entered an emergency ex parte order awarding Jessica temporary physical custody of J.S. and setting the matter for a hearing.

¶10. On November 28, 2022, the chancellor held a trial on Jessica's petition for emergency temporary custody and Rickey's complaint for custody and visitation. Jessica appeared pro se and did not call any witnesses.[2] Rickey was represented by counsel, and he called the

---

[2] The record reflects that throughout the chancery court proceedings, the chancellor strongly urged Jessica to retain legal counsel. The chancellor provided Jessica the name of a law firm that provided pro bono services. Whenever the chancellor urged Jessica to retain counsel, Jessica responded that she was representing herself. At the trial on Rickey's

following witnesses to testify: Devanna Watkins, a friend of both Jessica and Rickey who had spent time around the parties and J.S.; Delia Brown, Jessica's cousin; and Michelle Cain, Rickey's live-in girlfriend. The witnesses testified about Rickey and J.S.'s father-son relationship and Rickey's parenting skills. At the end of the trial, Jessica claimed for the first time that a man named Antrae was J.S.'s biological father. Jessica informed the chancellor that Antrae was willing to take a DNA test if needed. The chancellor asked Rickey's counsel if Antrae had been served with process, and counsel explained that Antrae had not been served because his identity had just been disclosed.

¶11. On December 16, 2022, the chancellor entered a final judgment finding that the doctrine of *in loco parentis* applied to Rickey. After considering the *Albright* factors, *see Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the chancellor found that it was in J.S.'s best interest for the parties to have joint legal and physical custody of J.S. The judgment set forth that Jessica would have custody of J.S. from Sunday at 6:00 p.m. through Friday at the time of school dismissal, and Rickey would have custody of J.S. from the time of school dismissal on Friday through Sunday at 6:00 p.m.

¶12. Jessica filed a motion for a new trial, which the chancellor denied. This appeal followed.

## STANDARD OF REVIEW

¶13. We review domestic-relations matters under the limited "substantial evidence/manifest error rule." *Ballard v. Ballard*, 289 So. 3d 725, 728 (¶7) (Miss. 2019). "[W]e will not

---

complaint for custody, Jessica informed the chancellor that she did not need any witnesses to testify.

disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous[,] or [applied] an erroneous legal standard." *Id*.

## DISCUSSION

¶14.    Jessica's sole argument on appeal is that the chancellor erred by awarding joint legal and physical custody to Rickey, the non-biological father.[3]    Jessica asserts that a non-biological father can petition the court for custody of a minor child under the doctrine of *in loco parentis* only in the absence of a biological father.  Jessica maintains that because Antrae, the "probable biological father," was not made a defendant to this action, the chancellor did not make any findings that would rebut the alleged natural-parent presumption as to Antrae.

¶15.    The Mississippi Supreme Court has explained that "[a] person *in loco parentis* is one who stands in place of a parent, having assumed the status and obligations of a parent." *Davis v. Vaughn*, 126 So. 3d 33, 37 (¶11) (Miss. 2013) (citing *Farve v. Medders*, 241 Miss. 75, 81, 128 So. 2d 877, 879 (1961)).  "Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child, is said to stand *in loco parentis*." *Id*.  While "this doctrine grants third parties certain parental rights, such rights are inferior to those of a natural parent." *Id*. at (¶12).  Accordingly, "in a custody dispute between one standing *in loco parentis* and a natural parent, the parent is entitled to custody unless the natural-parent

---

[3] On appeal, Jessica does not address or challenge the chancellor's *Albright* analysis. Nonetheless, our review of the record shows that the chancellor's *Albright* findings, as set forth in her opinion, are supported by the evidence and testimony presented at trial.

5

presumption is rebutted." *Id.*; *Welton v. Westmoreland*, 180 So. 3d 738, 744 (¶21) (Miss. Ct. App. 2015) ("[T]he natural parent presumption precludes a court from granting custody to a third party over the objection of a natural parent absent clear and convincing evidence that the natural parent has abandoned or deserted the child, has engaged in immoral conduct harmful to the child, or is an unfit parent." (internal quotation marks omitted)); *see also In re Waites*, 152 So. 3d 306, 314 (¶19) (Miss. 2014).

¶16. However, the supreme court has clarified that "[w]hile typically, the natural parent presumption must be overcome, certain circumstances have required a different outcome in light of justice and for the child's well-being." *Brownlee v. Powell*, 368 So. 3d 1268, 1272 (¶9) (Miss. 2023). "As such, *in loco parentis* status can sometimes be used to help rebut the natural parent presumption in these 'limited, unique situations.'" *Id.*, *see also Wells v. Smith* (*In re Smith*), 97 So. 3d 43, 47 (¶11) (Miss. 2012). Specifically, our jurisprudence has held the natural-parent presumption can be overcome in certain circumstances: (1) the non-biological father stands *in loco parentis*, (2) he has cared for and supported the child as his own and he has established a strong relationship with the child, (3) he could have been required to pay child support, and (4) the biological father has not been conclusively determined or is not really in the picture. *Ballard*, 289 So. 3d at 729-31 (¶¶12-23); *In re Smith*, 97 So. 3d at 47 (¶11); *J.P.M. v. T.D.M.*, 932 So. 2d 760, 769-70 (¶¶24-26) (Miss. 2006); *Griffith v. Pell*, 881 So. 2d 184, 186-87 (¶¶6-11) (Miss. 2004); *Welton*, 180 So. 3d at 744-48 (¶¶21-31).

¶17. We find that the facts of the case before us fall within the unique circumstances that

6

allow a person standing *in loco parentis* to be granted visitation or custody of the minor child over the objection of the child's natural mother. The record supports the chancellor's finding that Rickey stood *in loco parentis*. The testimony and evidence presented at trial show that until they received the results of the DNA test, both Rickey and Jessica believed that Rickey was J.S.'s biological father. It is undisputed that Rickey is listed as the father on J.S.'s birth certificate and that Rickey helped raise and financially support J.S. from his birth until the commencement of the proceedings. The chancellor also found that Rickey and J.S. "have a particularly close father-son relationship," and this finding is supported by the testimony and evidence presented at the custody hearing. Although a child support decree had never been entered in this case, we find that Rickey may have been required to pay child support for J.S. "because [Rickey] supported and cared for [J.S.] as if [he] were his own natural child," and testimony at trial showed that Jessica relied on Rickey's financial support of J.S. *Pell*, 881 So. 2d at 186 (¶8); *see also Logan v. Logan*, 730 So. 2d 1124, 1126 (¶9) (Miss. 1998). Jessica asserts that Antrae is J.S.'s "probable biological father"; however, the record contains no filing by Antrae expressing his desire to be recognized as J.S.'s father, and no DNA testing for paternity has been performed. The supreme court has held that in such cases, disestablishing the *in loco parentis* figure as the minor child's father is "not likely to be in [the child's] best interests." *J.P.M.*, 932 So. 2d at 770 (¶25). Likewise, we find that

> [b]ecause [J.S.'s] biological father has not been conclusively established and no man is seeking to fill [Rickey's] role as [J.S.'s] father, disestablishing [Rickey] as [J.S.'s] father would require [Jessica], [the Mississippi Department of Human Services], and the court system to expend additional time and resources in an effort to establish another man as [J.S.'s] father, without any guarantee that such an individual would pay child support or attempt to

7

establish a father-[son] relationship with [J.S.]. Such a result is not likely to be in [J.S.'s] best interests.

*Id.*

¶18. After our review, we find that the chancellor had the authority to grant joint legal and physical custody of J.S. to Rickey. We therefore affirm the chancellor's judgment.

¶19. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**